Surinder **BAINS**, Petitioner–Appellant,

v.

Steve **CAMBRA**; James H. Gomez, Director, Respondents–Appellees.

No. 98–17223.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 15, 1999.

Decided March 2, 2000.

Clifford Gardner, Gardner & Derham, San Francisco, California, for the petitioner-appellant.

Herbert F. Wilkinson, Deputy Attorney General, San Francisco, California, for the respondent-appellee.

Before: CHOY, CANBY, and SILVERMAN, Circuit Judges.

Opinion by Judge CHOY; Concurrence by Judge SILVERMAN; Dissent by Judge CANBY.

CHOY, Circuit Judge:

California state prisoner Surinder Bains ("Bains") appeals from the district court's denial of his habeas corpus petition. Having been convicted of first degree murder with the attendant special circumstance that the murder had been committed after lying in wait, Bains filed his petition alleging violations of his due process, equal protection, Sixth Amendment, and Fifth Amendment rights. For the reasons below, we affirm the district court's decision.

*Factual and Procedural Background*

In 1982, Bains's sister Balbinder Bains traveled to India in order to find a husband of the Sikh faith. Eventually, Bain's family and the family of Gurmeet Shergill ("Shergill") arranged for Bains's sister and Shergill to be married. Although Shergill initially expressed some reluctance to marry Bains's sister, he ultimately agreed to do so, and the two were married in India before returning to the United States. In 1983, Bain's sister gave birth to a son, Victor.

In 1984, Shergill started dating a different woman, and soon thereafter, he separated from Bain's sister. In 1986, he and Bain's sister were divorced. During this time, Shergill moved into a studio apartment, the location of which he tried to keep a secret from the Bains family. Despite Shergill's efforts to avoid the Bains family, they located his studio apartment and made several uninvited visits during which they threatened to harm Shergill (both before and after he obtained a divorce from Bains's sister). In early 1990, Shergill retained an attorney in order to resolve a dispute with Bains's sister over child support, child custody, and the ownership of a house in Sacramento.

In August of 1990, Shergill traveled back to India. On September 1, 1990, he telephoned his son from there. The next day, having discovered Shergill's whereabouts, wanting to find out whether Shergill had traveled to India in order to find a new wife, and hoping to renew her relationship with Shergill, Bains's sister visited Jaswinder Singh ("Singh"), Shergill's childhood friend. During the visit, Bains's sister mentioned to Singh that Bains had said that Shergill might be killed if he were to remarry.

On September 12, 1990, while Shergill was still in India, a resident of Shergill's apartment complex saw a man sitting in a car that was parked in her parking stall, which was located directly behind Shergill's stall. The resident asked the man to move his car out of her parking stall, and the man then drove away. The description of the man matched that of Rafael Hidalgo ("Hidalgo"), the man who ultimately would be convicted of murdering Shergill.

On September 13, 1990, while Shergill was still in India, another resident of Shergill's apartment complex saw a man standing in the carport and bending down to look at car license plates. The man seemed to be most interested in a red Acura, the same type of car that Shergill drove. The description of the man and his car matched that of Hidalgo and his car, although with slight differences.

Later that evening, at 7:32 p.m., according to the phone records from Shergill's apartment, someone made a one-minute phone call to Bains's house from the phone inside Shergill's apartment. At that moment, Shergill, having just returned from India, was at the airport. Scratch marks on the doorknob of Shergill's apartment door were consistent with those that would have been left if someone had picked the lock.

On September 18, 1990, another resident of Shergill's apartment complex saw an unfamiliar man standing near the door of Shergill's apartment. Upon noticing her, the man quickly walked away. The description of the man matched that of Hidalgo.

At 8 p.m., on September 23, 1990, neighbors of Shergill, a husband and his wife, heard scuffling, loud talking, and then a sudden scream originating from the carport area. They then saw three men running from the carport area. The description of one of the men matched that of Hidalgo. After seeing the three men flee, the husband immediately telephoned for emergency assistance and then went to investigate what had happened. He found Shergill lying on the ground and covered in what seemed to be blood. Shergill said that he had *not* been robbed and then mumbled something about three strangers.

During the same period of time, two other neighbors of Shergill heard a few screams and then saw three men leaving the carport area. The description of one of the men matched that of Hidalgo. Moreover, another neighbor also heard several screams and then saw at least two men fleeing the carport area. At least one man entered a car, the description of which matched that of Hidalgo's car.

By the time the police arrived, Shergill was unconscious, and about an hour later, he died. The autopsy of Shergill's corpse revealed a cut and four blunt traumas to his head, and two deep stab wounds in his chest. Shergill's hands and forearms had defensive-type wounds on them.

The police investigation of the crime scene recovered, among other things, a knife and a hammer, both of which could have inflicted the wounds suffered by Shergill. Although the two possible murder weapons did not have any usable fingerprints on them, the driver's door frame and window of Shergill's car did have Hidalgo's fingerprints on them. Moreover, tire tracks found near the crime scene matched those of Hidalgo's wife's car. Furthermore, Hidalgo's wife's car had several blood stains inside it, although none of the blood found matched that of either Shergill or Hidalgo.

On July 31, 1991, the police searched Bains's residence pursuant to a search warrant. They located, among other things, two phone ledgers containing the phone numbers for Hidalgo's home and office and his twin brother's home. They also found evidence of several phone calls: calls between Bains's residence and workplace and the homes of Hidalgo and his twin brother; calls from Bains's residence to Shergill's apartment; and of particular note, as mentioned above, a call from Shergill's apartment to Bains's residence at a time when Shergill was still at the airport. Moreover, the police uncovered a check for $200 that had been dated July of 1990, signed by Bains's wife, and deposited by Hidalgo.

Later, after approaching Hidalgo, but before placing him in custody, the police permitted him to call his home. Without letting Hidalgo know, the police recorded his phone call. During the phone call, Hidalgo said, "The person where we got the $200, tell them you don't know that person."

On the same day that the police searched Bains's residence, they arrived at Bains's workplace to ask him a few questions. Bains and the police then traveled to the police station and entered an unlocked interview room.[1] Once there, the police deceitfully told Bains that Hidalgo, upon being interviewed, had implicated Bains in the murder of Shergill. The police (three police officers and one polygraph examiner) then continued to question Bains for about six hours. Despite his eventual requests to speak with a lawyer and with his wife and to leave the police station, the police did not read Bains his

---

1. The parties dispute whether Bains or the police first suggested that questioning continue at the police station. However, the district court felt that regardless of which party made the suggestion first, the real question is whether Bains was coerced into going to the police station—a question that the state trial court had answered in the negative by finding that even if the police had made the suggestion first, Bains did not object to the suggestion.

*Miranda* rights until about four hours had passed, and they did not permit him at any time either to leave or to make any phone calls.

When he was being interviewed, Bains first claimed that he had been in contact with Hidalgo only while working overtime with him at the Maxim Corporation. Bains also originally claimed that he did not know Hidalgo's family or their phone numbers and that he had never loaned any money to Hidalgo. However, Bains later admitted several facts: he had spoken to Hidalgo after leaving the Maxim Corporation because Hidalgo had been looking for a new job; he actually did know Hidalgo's twin brother and his home phone number and possibly Hidalgo's home phone number; and he had met with Hidalgo recently when Hidalgo had shown up at Bains's new place of employment in order to fill out a job application. Ultimately, Bains admitted that he and Hidalgo's twin brother were friends and that he had both brothers' home phone numbers. Yet, Bains still refused to admit that he had spoken with Hidalgo during the week before the murder of Shergill or that he had any idea why Hidalgo had implicated him in the murder of Shergill.

In addition, Bains made statements about his family being upset over the current situation between Shergill and Bains's sister and about his family's attempts, including his own attempts, to speak with Shergill and Shergill's family about the current situation between Shergill and Bains's sister. Bains also made several statements about the strength of his Sikh beliefs and his duty to support his sister after her divorce. Bains seemed to say at first that he thought that Shergill had been murdered because of the divorce and that he did not know and had never asked how or where Shergill had been murdered. Yet, Bains later admitted to knowing where the murder had occurred.

Quite significantly, Bains made all of these statements before agreeing to be subjected to a polygraph test, and he re-quested to speak with a lawyer and with his wife and to leave the police station only after he had been informed that the results of the polygraph test had indicated that he had not been telling the truth.

At trial, the aforementioned witnesses and police officers testified about all of these events. The state trial court, however, concluded that Bains had been "in custody" for the purpose of triggering the *Miranda* requirements only after the first instance that he had requested to speak with a lawyer and with his wife and to leave the police station and had been denied his request. The state trial court therefore excluded all of the statements made by Bains after that time but admitted all of the statements made before that time.

A paid police informant, Raymond Delgado ("Delgado"), testified that he had befriended Bains while the two of them were in jail. Delgado claimed that Bains had confessed that he had hired someone for $30,000 to murder the husband of a family member because the family member was having child support and child custody problems with her husband. Delgado also claimed that Bains had told him that the hired killer had followed the family member's husband to his home from a fast food restaurant and then had stabbed him. However, at trial, Bains's lawyer presented considerable evidence to impeach Delgado's testimony: Delgado had stated that he was offering the information about Bains in order to ensure his admission into the federal witness protection program; Delgado had been reviewing court files in other people's cases and had been inquiring about Bains's case; and Delgado's testimony almost mirrored the contents of previously published news articles, including the factual errors contained within them (e.g., the number of children that Shergill and Bains's sister had, the amount of money that had been paid for the murder, and the manner in which the hired killer had stalked Shergill). Presumably motivated by the impeachment of Delga-

do's testimony, the state prosecutor said during the closing argument, "You can take Mr. Delgado's testimony and put it completely aside and examine what's left and you still have the same convincing showing of Mr. Bains's participation in this crime."

The prosecutor then presented evidence of several threatening statements made to Shergill by members of Bains's family. Bains's mother had issued a traditional threat to Shergill that he "should receive beating by shoes in the head." Bains's aunt had threatened Shergill by saying that he would not be allowed to live in the United States or in India if he divorced Bains's sister. Singh testified that Bains's sister had said that Bains had said that if Shergill returned from India with a new bride, then he would be killed. The trial court admitted such evidence as hearsay that under California law fell within the hearsay rule exception for statements made by co-conspirators.

In addition, the prosecutor presented the testimony of Shergill's mother, father, friends, and divorce attorney, all of whom suggested that Shergill was in fear for his safety because of the threats of Bains's family. The trial court admitted such evidence as hearsay that under California law fell within the hearsay rule exception for state-of-mind evidence.

Several other witnesses for the prosecution testified about the beliefs and customs of the Sikh community so far as marriage and divorce were concerned. These witnesses explained that Sikh families take the institution of marriage very seriously and feel very strongly that a husband must comply with his half of the marriage contract, especially since if a husband leaves his wife, his wife is considered to be "damaged goods" and an "unmarketable commodity," thereby causing the families of both spouses great hardship.

Along these same lines, Officer Johl ("Johl") of the Sutter County Sheriff's Department was qualified and accepted by the trial court as an expert in the Sikh religion and its practices. Johl testified that in the Sikh community, when a husband in an arranged marriage unilaterally decides to divorce his wife, the family of his wife, especially *its male members*, would attempt to bring the pair back together, and if the attempt at reconciliation failed, would attempt to exact "violent revenge or retribution" in order to save face. Johl also testified that "such escalation was not predictable or inevitable" and that "Sikhs are no more violent than anyone else" (as paraphrased by the California Court of Appeal).

During his closing arguments, the prosecutor emphasized these generalizations about followers of the Sikh faith and stated, among other things, "If you *do certain* conduct with respect to a Sikh person's female family member, look out. You can expect violence," and "What you don't understand, what Mr. Bains did understand and wanted Gurmeet to understand, was the laws in the United States is [sic] not what we're talking about. We're playing this game by Sikh rules." Moreover, the prosecutor emphasized the statements that Bains had made to the police regarding the strength of his belief in the Sikh faith and in the wrongness of Shergill's conduct toward Bains's sister.

The jury deliberated for eighteen hours over the course of four days before deciding to convict Bains.

◼ The California Court of Appeal affirmed the trial court's decision and reached the following conclusions: (1) the hearsay evidence of Shergill's fear of some violent retribution by Bains's family should not have been admitted; (2) the hearsay evidence of Bains's family's statements that violent retribution might be visited upon Shergill should not have been admitted, with the exception of the hearsay evidence of Bains's sister's statement to Singh about Bains's statement, which properly was admitted under the exception for a co-conspirator's statements; (3) the evidence of Sikh *attitudes* and values to-

ward marriage and divorce properly had been admitted to demonstrate possible motive and intent of Bains to commit the murder, but the evidence of a propensity of the general Sikh individual to use violence in specific situations should not have been admitted; and (4) despite the numerosity of the errors that occurred at trial, all of the errors taken together were harmless in light of the other evidence against Bains. Contrary to the apparent assumptions of both the federal district court and both of the parties, the California Court of Appeals expressly found that the admission of the propensity evidence was not an error of constitutional magnitude, and by applying the *Watson* harmless error standard [2] rather than the *Chapman* standard [3] in evaluating the issue, impliedly found the admission of the hearsay evidence of Shergill's fear was not an error of constitutional magnitude.

In his state habeas corpus petition filed in the California Supreme Court, Bains raised a claim that a *Miranda* violation had occurred during his questioning by the police. Instead of dismissing such claim on procedural grounds, the California Supreme Court issued a denial "on the merits" of Bains's entire appeal without providing any written explanation of the denial.

After considering Bains's § 2254 habeas corpus petition, the district court tentatively granted the petition. In its tentative decision, the district court, believing that there was no state court determination of the issue and that de novo consideration therefore was appropriate, held that a *Miranda* violation had occurred (without considering whether Bains's interrogation by the police could be divided into two sections-one before Bains had requested to speak with a lawyer and his wife and to leave, and one after). The district court then concluded that Bains's statements to the police therefore should have been suppressed in their entirety, viewed in the aggregate, the numerous errors that had occurred at trial were not harmless.[4]

In its final decision, having noticed that after a pretrial hearing, the state trial court actually had determined for itself that Bains had not been subjected to a custodial interrogation prior to his first requests, the federal district court denied the petition. The district court reached several conclusions: in light of the considerable deference that it owed to the state trial court's "essentially factual determination," Bains had not been "in custody," and no *Miranda* violation had occurred prior to Bains's first request to speak with a lawyer and with his wife and to leave the

2. The *Watson* harmless error standard is the standard applied by the California state appellate courts in reviewing non-constitutional magnitude, trial type errors. *See, e.g., People v. Watson,* 46 Cal.2d 818, 299 P.2d 243, 254 (1956). In applying the *Watson* standard, California state appellate courts determine whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." *See, e.g., id.* This standard under California state law is the equivalent of the *Brecht* standard under federal law, to wit, whether the errors had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Henry v. Estelle,* 33 F.3d 1037, 1041 (9th Cir.1993), *rev'd sub nom on other grounds, Duncan v. Henry,* 513 U.S. 364, 366, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 636–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

3. The *Chapman* standard is a "harmless beyond a reasonable doubt" standard applied (at least for direct appeals) by all courts (state and federal) in reviewing constitutional magnitude, trial type errors. *See, e.g., Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

4. The district court seemingly assumed that the numerous errors that had occurred at the trial level were of constitutional magnitude (and therefore were reviewable as matters of federal law). Yet, the district court never really came right out and said as much. However, in its issuance of the certificate of appealability, the district court did suggest that it considered the errors to have been of constitutional magnitude.

police station; no suppression of Bains's statements made prior to his first requests therefore was necessary; and in the final analysis, the state appellate court's conclusion as to the harmlessness of the errors that had occurred at trial was not unreasonable under federal law.

After considering Bains's motion to alter or amend the judgment, the district court amended its final decision by removing the section discussing the state court's determination as to whether Bains had been "in custody." The district court left intact the section noting that the state trial court's treatment of the *Miranda* issue was not erroneous because the trial court properly had excluded the statements made by Bains following his first request to speak with a lawyer and with his wife and to leave the police station. Moreover, the district court made additional observations: the California Court of Appeal had performed its harmless error review under both the *Watson* and the *Chapman* standards; the district court had performed its own harmless error review under the *Brecht* standard and had concluded for itself that the errors that had occurred at trial were harmless; and because the California Court of Appeal already had performed its harmless error review under the *Chapman* standard, the federal district court did not need to perform its own harmless error review under that much more exacting standard.

*Discussion and Analysis of Law*

I. *General Standards of Review.*

■ A federal court will not grant a habeas corpus petition on the basis of any claim that was decided in a state court unless the state court's adjudication of that claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d). In reviewing such a petition, a federal court is bound by the state court's interpretations of state law. *See, e.g., Wainwright v. Goode,* 464 U.S. 78, 84, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983). A federal court must presume the correctness of the state court's factual findings. *See* 28 U.S.C. § 2254(e)(1).

II. *Absence of Any Statements To Be Suppressed (* Miranda *Issue).*

■ The critical inquiry here is not whether a *Miranda* violation occurred but rather when it occurred. An individual is "in custody" at the point a reasonable person would feel that he was not free to terminate the interrogation. *See, e.g., Thompson v. Keohane,* 516 U.S. 99, 111–12, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The district court concluded that the "in custody" inquiry was " 'essentially a factual determination' " (citing *Medeiros v. Shimoda,* 889 F.2d 819, 822 (9th Cir.1989) and *United States v. Booth,* 669 F.2d 1231, 1235 (9th Cir.1981)), and thus seemingly afforded a high level of deference to the state trial court's determination of this issue. The Supreme Court in *Thompson,* 516 U.S. at 111–12, 116 S.Ct. 457, however, held that the inquiry is really a mixed question of law and fact, which is subject to de novo review by appellate courts. While the ultimate issue of when Bains was "in custody" is subject to de novo review, the state trial court's answers to the "scene- and action-setting questions" (i.e., the underlying factual questions) still are entitled to a presumption of correctness. *See, e.g., id.*

■ In the present case, the state trial court determined that, as a factual matter, either Bains himself suggested that his questioning by the police continue at the police station or he simply chose not to object when the police suggested that his questioning continue at the police station. In either event, according to the state trial court's determination, Bains was not "coerced" into going to the police station and instead "voluntarily" accompanied the

police to the police station. While this determination is not decisive of the ultimate "in custody" issue, it nevertheless must be presumed to be correct so far as setting the scene and reconstructing Bains's and the police's lines and actions are concerned. *See, e.g., id.*

█ There is no evidence here to suggest that, under clearly established federal law, a reasonable person in Bains's situation would have felt that he was not free to terminate the police interrogation, at least until the first time that he requested to speak with a lawyer and with his wife and to leave the police station and had his requests denied by the police. Although Bains was questioned by several police officers, who in fact had lied to him about whether Hidalgo actually had made incriminating statements about him, such admittedly targeted questioning solely by virtue of occurring at a police station does not constitute a custodial interrogation sufficient to trigger the requirements of *Miranda. See, e.g., Oregon v. Mathiason,* 429 U.S. 492, 495–96, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). At the very least, the state courts' (i.e., the trial court's and the California Supreme Court's) determinations that no *Miranda* violation occurred until after Bains first had made his requests, cannot be said to have been so erroneous that they can be said to have resulted "in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." Therefore, since all of the relevant self-incriminating statements made by Bains to the police were made prior to his first requests (and thus prior to the occurrence of any *Miranda* violation), we hold that their introduction at trial was permissible.

III. *Three Constitutional Magnitude, Trial Type Errors.*

A. *Testimony as to Shergill's State of Mind (Hearsay Evidence).*

█ The Sixth Amendment Confrontation Clause, applicable to state prisoners

through the Fourteenth Amendment, requires that in order to introduce relevant statements at trial, state prosecutors either produce the declarants of those statements as witnesses at trial or demonstrate their unavailability. *See, e.g., Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Moreover, in the event that state prosecutors successfully demonstrate the declarants' unavailability, they still must show that the hearsay statements sought to be introduced bear some adequate indicia of reliability, for example, by falling within a firmly rooted exception to the hearsay rule. *See, e.g., White v. Illinois,* 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).

In the present case, the California Court of Appeal impliedly concluded that the admission of the hearsay evidence of Shergill's fear that Bains's family might try to hurt or kill him was not error of constitutional magnitude, and the district court seems to have only assumed as much. This error, however, violated Bains's Sixth Amendment right to confront the witnesses against him. The prosecutor did not and quite obviously could not produce Shergill, the murder victim, as a witness at trial. Moreover, as the California Court of Appeal concluded as a matter of state law, and as we find to be correct as a matter of federal law, evidence of Shergill's beliefs about the Bains family's intentions toward him was not admissible under the exception to the hearsay rule for statements of the declarant's state of mind (or any other exception) in order to prove the truth of those beliefs. *See, e.g.,* Fed.R.Evid. 803(3); *United States v. Fontenot,* 14 F.3d 1364, 1371 (9th Cir.1994). Thus, under clearly established federal law, we hold that the admission of such hearsay evidence clearly violated Bains's Sixth Amendment right to confront the witnesses against him. *See, e.g., id.*

B. *Testimony as to Threats Made by Bains's Family (Hearsay Evidence).*

█ In the present case, the California Court of Appeal concluded that with the

exception of Singh's testimony as to the threats made by Bains that were relayed to her by Bains's sister, the admission of the hearsay evidence of the threats made by Bains's family was an error of constitutional magnitude. The district court seems to have agreed, and we also agree with this assessment. There is no indication that the prosecutor produced any member of Bains's family as a witness at trial. Moreover, as the California Court of Appeal concluded as a matter of state law, and as we find to be correct as a matter of federal law, the statements of Bains's family (with the exception of those made by Bains's sister to Singh) were not made during the course of, and in furtherance of, a conspiracy and were not admissible under the exception to the hearsay rule for statements made by a co-conspirator. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Thus, under clearly established federal law, we hold that the admission of such hearsay evidence clearly violated Bains's Sixth Amendment right to confront the witnesses against him. *See, e.g., id.*

C. *Appeals to Racial, Ethnic, and/or Religious Prejudice.*

■ Most of the relevant testimony presented, and the closing arguments made, by the prosecutor involving the beliefs of the adherents of the Sikh religion only were provided to explain the Sikh beliefs concerning marriage and divorce and thereby only were provided to offer a potential motive and to show a clear intent of Bains to have murdered Shergill. A not insignificant portion of the prosecutor's closing arguments, however, highlighted the relevant testimony in a way that went beyond merely providing evidence of mo-

tive and intent (i.e., without limiting his generalizations about Sikh persons as Officer Johl did at the end of his own testimony) and that invited the jury to give in to their prejudices and to buy into the various stereotypes that the prosecutor was promoting.

■ It is evident under clearly established federal law that this very kind of conduct by a prosecutor (to the extent that it involves either race or ethnicity) violates a criminal defendant's due process and equal protection rights. *See, e.g., McCleskey v. Kemp,* 481 U.S. 279, 309 n. 30, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (noting that "the Constitution prohibits racially biased prosecutorial arguments"); *Kelly v. Stone,* 514 F.2d 18, 19 (9th Cir.1975); *Fontanello v. United States,* 19 F.2d 921, 921–22 (9th Cir.1927); *see also United States v. Vue,* 13 F.3d 1206, 1212–13 (8th Cir.1994) (holding that the making of prosecutorial arguments associating members of a particular ethnicity and from a particular geographic region with the commission of drug-related offenses violated the criminal defendant's constitutional rights); *United States v. Doe,* 903 F.2d 16, 21–29 (D.C.Cir. 1990); *United States v. McKendrick,* 481 F.2d 152, 156–61 (2d Cir.1973) (concluding that a constitutional violation occurred when a state prosecutor's closing arguments invited the jury members to view "colored people" as an entity separate and apart from themselves).[5]

In its decision, however, the California Court of Appeal concluded that because the general beliefs of the Sikh faith already had been presented permissibly as evidence of Bains's motive and intent, the limited use by the prosecutor of conceded-

---

**5.** It is not inconceivable that the prosecutor's discriminatory remarks against Sikh persons actually were a form of religious rather than racial or ethnic discrimination. After all, the technical definition of Sikhism is that it is an offshoot of the Hindu religion. Given the correlation between being a Sikh and being racially and ethnically Indian and the prosecutor's comparison of being an American and

being a Sikh, the classification also seems to have racial and ethnic components. Moreover, although perhaps to a lesser extent, religion-based prosecutorial arguments also are prohibited under clearly established federal law. *See, e.g., United States v. Amlani,* 111 F.3d 705, 714–15 (9th Cir.1997) (citing several out-of-circuit authorities).

ly impermissible arguments did not have any significant prejudicial effect on the jury and therefore should not be deemed to be harmful error, let alone a constitutional magnitude error at all. We disagree.[6] The circumstances of the present case are not like those of *United States v. Santiago,* 46 F.3d 885, 891 (9th Cir.1995), where a prosecutor's improper use of a potentially objectionable term (in that case, the gang name "the Mexican Mafia") for ambiguous reasons amidst an overall dispassionate and intelligent presentation was held not to be sufficiently prejudicial so as to constitute an equal protection violation. Here, the prosecutor relied upon clearly and concededly objectionable arguments for the stated purpose of showing that *all* Sikh persons (and thus Bains by extension) are irresistibly predisposed to violence when a family member has been dishonored ("If you do certain conduct with respect to a Sikh person's female family member, look out. You can expect violence.") and also are completely unable to assimilate to and to abide by the laws of the United States ("[T]he laws in the United States [are] not what we're talking about. We're playing by Sikh rules."). Such prosecutorial arguments were actually more a statement about the stereotypical "nature" of a particular group rather than an explanation of the beliefs followed (to different degrees and in different ways) by some members of that group.

The fact that much evidence already had been permissibly introduced to show Bains's motive and intent does not alleviate these concerns. Such evidence, as does most evidence, permitted several inferences to be drawn, some permissible (e.g., Bains, a particular Sikh person, may have had a motive to kill Shergill) and others impermissible (e.g., Bains, like all other Sikh persons, solely on account of his being a Sikh rather than any other kind of

person, was compelled to kill Shergill). Thus, the introduction of clearly inflammatory prosecutorial arguments very well might have had the effect of motivating the jury to draw and to focus upon the impermissible inferences from the otherwise properly admitted evidence of Sikh beliefs, thereby bolstering the prejudicial effect of the prosecutorial arguments-rather than minimizing their prejudicial effect as hypothesized by the state government and the California Court of Appeal. Moreover, this danger was exacerbated by the state trial court's reluctance to issue limiting instructions to the jury as to its consideration of the expert testimony and the prosecutorial arguments relating to adherents of Sikh beliefs. *See, e.g., Amlani,* 111 F.3d at 714–15 (noting that the prejudicial effect of the prosecutor's arguments were contained because, *inter alia,* the trial court had issued limiting instructions to the jury).

### IV. *Harmless Error Analysis.*

### A. *Review of the California Court of Appeal Determination.*

■ Since the California Court of Appeal failed to recognize two errors as being of constitutional magnitude, it necessarily also failed to select the appropriate standard in evaluating the harmlessness of those errors. To wit, by deeming two errors as being merely errors under state evidentiary law, the California Court of Appeal improperly selected the *Watson* standard rather than the *Chapman* standard in evaluating those errors. Arguably, such improper selection would *permit* a federal district court to grant the habeas corpus petition with the condition that the petition would not be granted if the California Court of Appeal were to reevaluate those errors under the appropriate standard of review. *See, e.g., Jeffries v. Wood,*

**6.** Moreover, as a preliminary matter, *United States v. Vue,* 13 F.3d 1206, 1212–13 (8th Cir.1994), the only case cited by the California Court of Appeal as support for this line of reasoning, does not make any mention of the

proposition that the admission of permissible evidence can render the admission of otherwise impermissible evidence not merely harmless but also permissible.

114 F.3d 1484, 1500–01 (9th Cir.1997) (en banc) (permitting such a course of action where a state appellate court did identify an error as being of constitutional magnitude but then selected the wrong harmless error standard; noting that "the [Antiterrorism and Effective Death Penalty] Act if applied would not *preclude* the issuance of a writ of habeas corpus") (emphasis added). However, contrary to Bains's argument, the precedent cited by him does not support the proposition that a federal district court would be *required* to take such action under such circumstances, and much precedent supports the opposite proposition (i.e., that the federal district court is free to conduct its own independent review and to make its own determination). *See, e.g., Hanna v. Riveland,* 87 F.3d 1034, 1038 & n. 2 (9th Cir.1996) (permitting independent harmless error review by a federal district court where the state appellate courts had failed to identify a constitutional error and thus had not conducted any harmless error review). Because the federal district court here did in fact choose to conduct its own independent review of the harmlessness of the state trial court errors, we now review the appropriateness of the federal district court's determination.

### B. *Independent Review by the Federal District Court.*

In conducting its own independent harmless error review, erroneously believing that the California Court of Appeal had in fact applied the *Watson* and *Chapman* standards of harmless error review to all three of the errors committed at the trial level, the federal district court here applied the less stringent (i.e., in terms of being more forgiving of trial-type errors) *Brecht* standard. In *Brecht,* the Supreme Court held that a less stringent harmless error standard should be applied in 28 U.S.C. § 2254 habeas corpus cases where

the state appellate court already had conducted a harmless error review (albeit in an improper manner) and the federal district court was conducting its own independent harmless error review. *See Brecht,* 507 U.S. at 636–38, 113 S.Ct. 1710. Attempting to limit the holding of *Brecht* to the particular facts of that case, and seeking to distinguish those facts from the facts of his case, Bains now argues that the more stringent *Chapman* standard should have been applied where, as here, the state appellate courts never even had an opportunity to conduct their own harmless error review (because they did not find any constitutional errors susceptible to such review). We reject this argument and affirm the district court's selection and application of the *Brecht* standard.

We previously have not decided this issue. *See, e.g., Hanna,* 87 F.3d at 1038 n. 2. However, as pointed out by Bains, the Eighth Circuit and a handful of federal district courts have argued that the *Chapman* standard should be applied where, as here, the state courts simply failed to identify certain constitutional errors and thus did not have the occasion to conduct their own harmless error analyses. *See, e.g., Orndorff v. Lockhart,* 998 F.2d 1426, 1430 (8th Cir.1993).[7] These courts have argued that the holding of *Brecht* is not applicable when there is no state court harmless error ruling to which the federal district court can defer. *See, e.g., id.* Moreover, these courts have held that in the absence of any express indication in *Brecht* as to whether its holding should be read broadly or narrowly, its holding should be limited to the facts that were present there (i.e., the state court had identified constitutional errors but then simply had failed to apply the proper standard for its harmless error analysis). *See, e.g., id.*

Yet, at last count, the Third, Fourth, Fifth, Sixth, Seventh, Tenth, and Eleventh Circuits have held that in habeas corpus

---

7. *See also Lyons v. Johnson,* 912 F.Supp. 679, 687–89 (S.D.N.Y.1996); *Rickman v. Dutton,* 864 F.Supp. 686, 712 (M.D.Tenn.1994).

cases, federal district courts always should apply the *Brecht* standard when conducting their own independent harmless error review, regardless of what, if any, type of harmless error review was conducted by the state courts. *See, e.g., Tyson v. Trigg,* 50 F.3d 436, 446–47 (7th Cir.1995).[8] These courts have argued that the language used in the *Brecht* opinion suggests that its holding should not be limited to its particular facts, especially since the specific factual pattern at issue in *Brecht* was a rather uncommon one (i.e., state courts tend more frequently simply to fail to recognize constitutional errors entirely rather than to recognize constitutional errors as such, but then to conduct improper harmless error analyses), and thus the harms sought to be avoided by implementing the *Brecht* holding would be avoided only in a very small minority of cases. *See, e.g., id.* Moreover, these courts also have argued that the interests laid out in *Brecht* (i.e., finality of state court convictions, comity, federalism, and prominence of the trial itself) are disserved by a reversal stemming from a federal district court decision, regardless of whether the state court's "mistake" was simply applying the wrong harmless error standard or rather failing to identify constitutional errors entirely and thus never having had the chance to conduct its own harmless error analysis. *See, e.g., Hassine,* 160 F.3d at 951. The fact that there was no state court harmless error ruling that would be supplanted was immaterial; what was material was that, for whatever reason, a state court conviction would be interfered with by a federal district court. Furthermore, some of those courts also have noted that judicial decision-making costs would be greatly increased by requiring federal courts to delve into the harmless error methodology used by the state courts in every case so as to determine whether the *Brecht* or the *Chapman* standard should be applied at the federal level. *See, e.g., Sherman,* 89 F.3d at 1141.

For the reasons listed in the preceding paragraph, we now join the vast majority of our sister circuits by deciding that the *Brecht* standard should apply uniformly in all federal habeas corpus cases under § 2254.

Turning to the district court's application of the *Brecht* standard, and having reviewed the record below, we conclude that such application was proper. As emphasized by the California Court of Appeal, and as impliedly agreed with by the federal district court, given the telephone calls linking Bains with Hidalgo and his twin brother (especially the telephone call to Bains's home from Shergill's apartment at a time when Shergill was at the airport), the check for $200 that had been drawn by Bains and had been endorsed by Hidalgo (and very likely had been alluded to by Hidalgo during his pre-arrest phone call as something the details of which should be kept hidden from the police), the self-incriminating statements (i.e., the highly suspicious lies) made by Bains to the police, and the powerful evidence of Bain's motive and intent to murder Shergill, a strong case against Bains remained even in the absence of the erroneously admitted evidence. Moreover, the errors committed here did not involve the more sensitive structural aspects of the trial, such as the use of peremptory challenges or the composition of the grand jury, such that the errors might be said to have infected the entire process and rendered any outcome necessarily suspect. *See, e.g., Smith v. Farley,* 59 F.3d 659, 663–64 (7th Cir.1995). Therefore, we conclude that in applying the less stringent *Brecht* standard, the district court properly did not have any "grave doubt" about whether the errors here had "a substantial and injuri-

---

8. *See also, Hassine v. Zimmerman,* 160 F.3d 941, 951 (3d Cir.1998); *Sherman v. Smith,* 89 F.3d 1134, 1141 (4th Cir.1996); *Hogue v. Johnson,* 131 F.3d 466, 499 (5th Cir.1997); *Gilliam v. Mitchell,* 179 F.3d 990, 995 (6th Cir.1999); *Castro v. Oklahoma,* 71 F.3d 1502, 1515–16 & n. 14 (10th Cir.1995); *Horsley v. Alabama,* 45 F.3d 1486, 1492 n. 11 (11th Cir.1995).

ous effect or influence in determining the jury's verdict." The errors that occurred at trial do not provide sufficient reason to doubt under the *Brecht* standard the district court's final conclusions as to the legitimacy of the process and the correctness of the outcome of Bains's trial.

### Conclusion.

For the reasons above, we affirm the decision of the district court.

**AFFIRMED.**

SILVERMAN, Circuit Judge, concurring:

There is no denying that errors occurred at the trial of this case. The only issue on habeas review is whether the errors were harmless. I agree with Judge Choy's analysis of the *Brecht* issue and write separately only to emphasize the strength of the prosecution's evidence that *was* properly admitted.

The fingerprints of Bains's co-defendant, Hidalgo, were found on the driver's door frame of the victim's car. In addition, he had been positively identified lurking around the victim's apartment and inspecting his car. Tire tread marks connected Hidalgo's vehicle to the crime scene, as did damage to Hildago's car bumper which matched damage found at the victim's carport where the murder occurred.

Telephone records established that ten days before the murder, on the day the victim returned from India but before he arrived home from the airport, someone placed a phone call to Bains's home from the victim's apartment. The testimony strongly supports the inference that it was Hidalgo.

Bains originally told police that he barely knew Hildago and that he did not know his phone number. However, a search of Bains's residence revealed two telephone ledgers containing Hidalgo's home and workplace phone numbers, and the home phone number of Hidalgo's brother. Police also found at Bains's home a check register listing a $200 check to which Hidalgo's name had been added and that Hidalgo had endorsed—a check that Hidalgo, after his arrest, sought to conceal. In addition, telephone records established that within the ten days prior to the murder, over twenty telephone calls were placed from Bains's home to Hidalgo's home, Hidalgo's work or Hidalgo's brother, and from Bains's phone to the victim's apartment.

As the district judge found, "In light of the phone records demonstrating many calls between petitioner and Hidalgo, [Bains's] denials to the police that he had any relationship with Hidalgo were particularly damaging to his defense."

An essential ingredient of Judge Canby's thoughtful dissent is his conclusion that virtually all of Bains's statements were obtained in violation of *Miranda* and therefore, cannot be taken into account in the harmless error equation. It is true that without the statements, the case against Bains falls apart. However, as Judge Choy has demonstrated—and as the district judge and the state courts also have found—the evidence amply supports the conclusion that Bains was not in custody at the time he made his incriminating statements and therefore, that *Miranda* did not require their suppression. The evidence is undisputed that Bains went to the police station voluntarily. He was not under arrest, in handcuffs, placed in a cell or in a locked room. Although Judge Canby makes the point that "[Bains] was not informed that he was free to leave at any time[,]" Dissent at 2293, *Miranda* simply does not require that the police tell suspects, "You have the right to leave."

I see no *Miranda* significance in the fact that "Bains had been home that morning when a search warrant was executed at his house[ ]" or that he voluntarily rode to the police station in a police car instead of driving himself. Dissent at 979. It is undisputed that Bains voluntarily agreed to go to the police station and answer

questions. It is custodial interrogation that triggers *Miranda*'s requirements, not the fact that an investigation has focused on a suspect or that he rode to the station in a police car. *See Beckwith v. United States,* 425 U.S. 341, 346–47, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

It is true that at some point, the interrogation of Bains became custodial. The transcript of the interview is 264 pages long. At page 183, Bains asked to go home and come back the next day, a request that was denied. In my view, *that* is when the interrogation turned custodial.[1] The fact that Bains, prior to that point, attempted to assert his desire *to leave and to voluntarily return* the next day clearly shows that he did not consider himself in custody, i.e., "that questioning [would] continue until he provide[d] his interrogators the answers they seek." *See Berkemer v. McCarty,* 468 U.S. 420, 438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). And it strongly supports a finding that he was *not* in custody until his request to leave was denied. *See Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

Although this was not a perfect trial, I agree with Judge Choy and the district judge that it passes the *Brecht* test.

CANBY, Circuit Judge, dissenting:

With all due respect, I dissent from the majority opinion. In my view, the combination of constitutional errors committed at Bains's trial " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

In the first place, I conclude that the *Miranda* violation occurred at or shortly after the beginning of the questioning of Bains at the police station, and that none of his statements made during the interrogation should have been admitted in evidence.[1] The question to be answered in determining whether there is custody for purposes of *Miranda* is: "given th[e] circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The circumstances were that Bains had been home that morning when a search warrant was executed at his house. Police had later come to his workplace to question him, but he did not want to be questioned at work. It is not clear who suggested the police station, but in any event the police drove Bains there. At the station, he was placed in an interview room with two officers (two additional officers, one a lie detector operator, later took part). He was not informed that he was free to leave at any time. Before any substantial questioning occurred, the officers falsely informed Bains that Hidalgo, who had been arrested for the murder, had "pointed a finger" at Bains.[2] Bains

---

1. The prosecution stipulated that it would not, and it did not, introduce any statements Bains made after page 170, when he requested a lawyer.

1. Bains raised his *Miranda* claim at trial and in his habeas petition to the California Supreme Court, which tersely denied the petition "on the merits." The State has not contended in the present appeal that Bains failed to exhaust his *Miranda* claim, or that it has been procedurally defaulted.

2. It is true that in *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), the Supreme Court stated that a false statement of incriminating evidence "has nothing to do with whether respondent was in custody for purposes of the *Miranda* rule." *Id.* at 496, 97 S.Ct. 711. This statement, however, was made before the Supreme Court ruled that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Certainly a reasonable person would consider it a factor, in determining freedom to leave, that a witness had identified him or her to the police as the perpetrator of the murder that was under investigation.

had not been many years in this country, and he had had no prior involvement with the criminal justice system. The transcript of the interrogation reveals considerable language difficulty. I conclude that, from the beginning of the questioning, a reasonable person in Bains's position would not believe that he was free to terminate the interrogation, leave the closed-door interview room, and depart (without a car). And that reasonable person's understanding, as it turns out, would have been wholly accurate: Bains was interrogated for six hours, and was denied permission to leave or call his wife.

The state court determined that the interrogation became custodial only after Bains made a rather confused reference to an attorney and questioning continued. But the obligation to honor Bains's request for an attorney arises from *Miranda*, and depends upon Bains's being in custody. His mention of an attorney did not create custody; the circumstances and surroundings did. Indeed, it is difficult to re-read *Miranda* without concluding that Bains's interrogation is exactly the kind that *Miranda* had in mind when it required warnings. *See Miranda v. Arizona,* 384 U.S. 436, 449–58, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (emphasizing effect of isolation in intimidating surroundings of station house). From the outset, a reasonable person in Bains's position would have been "aware that questioning will continue until he provides his interrogators the answers they seek." *Berkemer v. McCarty,* 468 U.S. 420, 438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). It was thus *Miranda* error for the trial court to conclude that Bains was not in custody in the station house interview room during the extensive first part of his interrogation, which extends through 170 pages of transcript.

As the majority opinion holds, and I agree, there were three additional constitutional errors committed at Bains's trial: (1) admission of hearsay testimony concerning Bains's state of mind; (2) admission of hearsay testimony concerning threats made by other members of Bains's family; and (3) argument (and, I would add, some testimony) emphasizing that violence is to be expected from Sikhs.

On the first two points, I have nothing to add to the cogent discussion in the majority opinion. With regard to the third error, I would add that testimony as well as argument went beyond constitutional bounds. A sheriff's department employee who had been raised as a Sikh testified as an expert on the Sikh culture. Bains did not object to testimony about the seriousness with which Sikhs regarded the marriage contract. He did object, however, to testimony of which the following exchange is an example:

Q. By virtue of your own roots within the Sikh community as well as your law enforcement experience in Sutter County, are you familiar with violence, the potential for violence, generally within the Sikh community based upon cultural values?

A. Yes.

Q. Can you tell the ladies and gentlemen of the jury whether these are cultural values within the Sikh community which, if violated or perceived to be violated, can be expected to have the potential for life-threatening violence?

A. Could be a number of things, something that transpired back in India and it's carried over here to America, or could be a sour or bad marriage between the arranged marriages where the female is divorced and some type of action, I guess if you want to call it, has to be taken by the other party.

Q. I want to go in a little bit more detail, but as I understand it, at this point there are in general such as things, feuds between families which cause potential for violence to the extent that the feuds even follow the families across the ocean to the United States?

A. Yes.

Q. And with respect to the traditional Sikh values as they arose in the Punjabi

[sic] and have come to the United States, are there very strong feelings among the community concerning the topic of divorce?

A.  Usually is, yes.

Q.  Now, especially I want to direct your attention to a situation in which there's been arranged marriage and of the two participants in the arranged marriage the wife continues to desire the marriage-wants the marriage to continue.

Under those circumstances if the husband were to decide, for whatever reason that he wanted, to terminate the marriage relationship and obtain a divorce, is that the type of behavior that, in your experience, could lead to violence and potentially deadly violence?

A.  Yes.

Although the witness later explained that violence did not always follow, the effect of this testimony is to cause the jury to focus on the proposition that, in his family situation, Bains was likely to have committed violence because he was a Sikh.

Then, in final argument, the prosecutor at several points reinforced this tendency. Among the many references to the different values and tendencies of Sikhs were the following:

> ... [A]nyone who is familiar with the Sikh culture, especially as it's practiced by relatively conservative tradition-oriented and traditional Sikhs is going to find out that, unlike the culture here in the United States, if you do certain conduct with respect to a Sikh person's female family member, look out.  You can expect violence.
>
> \*      \*      \*      \*      \*      \*
>
> It's a very traditional society in which those who conservatively follow its vast values and tenets can predictably be shown to-to acknowledge significance

about several things.  The wearing of a turban, the maintenance of a beard, and the carrying of a dagger.  Was there some symbolic ritualistic meaning of the way Gurmeet Shergill was killed?  Was he left dying in a pool of blood as a statement to the rest of the Sikh community by Bains?  Is that a death that had significance far beyond your understanding as common lay persons from a cross-section of the American culture? Think about it.

\*      \*      \*      \*      \*  .  \*

Everybody seems to agree that this is primitive killing amidst a bunch of sophisticated preparation.  That's going to remain the status of the case forever. Do you need a reasonable explanation? Other than every Sikh who reads about this case is going to understand that the Bains clan avenged their honor, they did what was expected of them.

The State does not contest the holding of the state appellate court that the references to the Sikh tendency toward violence constituted error.  It argues only that the error was harmless, and the majority here agrees.

The egregiousness of the emphasis on Sikh tendencies toward violence weighs heavily in the balance, in my view.  Moreover, because I conclude that *Miranda* was violated by admitting Bains's statements made during the interrogation, I exclude those statements from the prosecution's side of the harmless-error balancing process.[3]  In the absence of those statements, in which Bains denied contact with Hidalgo, the fact that telephone calls were made between Bains and Hidalgo loses its incriminating value.  The most important remaining evidence against Bains is the $200 check from his wife to Hidalgo, and the telephone call from the victim Gurmeet's house to Bains's resi-

---

**3.**  I note that the district court, upon initially ruling that there had been a *Miranda* violation, determined that the *Brecht* standard had been met and the writ should issue.  The

district court changed that determination only when it reconsidered its *Miranda* ruling and found no violation.

dence at a time when Gurmeet was arriving at the airport. The jury, however, rejected the special circumstance of murder committed for financial gain; it apparently concluded that the $200 had nothing to do with the murder. The one-minute telephone call from Gurmeet's apartment to Bains's residence, with contents or recipient unknown, an hour before Gurmeet arrived at the airport from India and ten days before his murder, is certainly adverse but not enough to sustain a conclusion that Bains would have been convicted if all of the constitutional errors had not occurred.

The state appellate court, in finding all errors harmless, concluded that there had been no *Miranda* violation. It also relied heavily on the testimony of Bains's cellmate that Bains had confessed that he arranged the murder for $30,000. This testimony was even more suspect than most cellmate confessions; the cellmate's testimony was so thoroughly impeached at trial that the prosecutor partially distanced himself from it in final argument, and the jury appears to have disregarded it in finding no financial gain special circumstance with regard to the murder. The cellmate confession is entitled to no weight in the harmless error balancing.

As the majority opinion points out, the state appellate court failed to apply the requisite *Chapman* standard of constitutional harmless error. *See Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). I need not determine whether that failure affects our standard of review, for I conclude that the combina-

tion of constitutional errors that occurred at Bains's trial meets even the deferential standard of *Brecht v. Abrahamson*, 507 U.S. at 637, 113 S.Ct. 1710.[4] The errors, considered together, "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (internal quotation marks omitted). The *Miranda* violation, the inflammatory evidence regarding the violent tendencies of Sikhs, and the hearsay violations of the confrontation clause, in my view, influenced the verdict in this case.

In order for us to overturn the state's conviction on a legal ground decided by the state, AEDPA requires the state court's adjudication to have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). That requirement is met in this case. The admission of Bains's statements made during the station house interrogation was contrary to the Supreme Court's decision in *Miranda*. In addition, the state's failure to apply the *Chapman* harmless error standard on direct review is contrary to *Chapman* itself, as well as to *Brecht*. *See Brecht*, 507 U.S. at 636, 113 S.Ct. 1710 (*Brecht* review on habeas is appropriate because state will have been required to conduct *Chapman* review); *see also Jeffries v. Wood*, 114 F.3d 1484, 1500–01 (9th Cir.1997) (en banc) (state failure to apply *Chapman* is adjudication.contrary to clearly established federal law as deter-

---

**4.** The Eighth Circuit has ruled that, when the state court erroneously fails to review for harmless error under the *Chapman* standard, then the federal court on habeas review should judge harmlessness under the *Chapman* standard, not the more deferential *Brecht* standard. *See, e.g., Harrington v. Iowa*, 109 F.3d 1275, 1279 (8th Cir.1997). Other circuits have held that *Brecht* is the habeas standard even when the state courts have failed to apply *Chapman*. *See Sherman v. Smith*, 89 F.3d 1134, 1140–41 (4th Cir. 1996); *Hogue v. Johnson*, 131 F.3d 466, 499 (5th Cir.1997); *Tyson v. Trigg*, 50 F.3d 436,

446–47 (7th Cir.1995); *Brewer v. Reynolds*, 51 F.3d 1519, 1529 (10th Cir.1995). The Fifth Circuit has since observed that its rejection of the *Chapman* standard, while still binding in the Fifth Circuit, appears to be inconsistent with the underlying rationale of *Brecht*. *See Barber v. Johnson*, 145 F.3d 234, 236–37 (5th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 518, 142 L.Ed.2d 430 (1998); *see also Crespin v. New Mexico*, 144 F.3d 641, 649 n. 6 (10th Cir.) (argument that *Chapman* should apply has some merit, but *Brewer* binds panel and precludes application), *cert. denied*, —— U.S. ——, 119 S.Ct. 378, 142 L.Ed.2d 313 (1998).

mined by Supreme Court, for purposes of AEDPA).

Thus Bains's petition meets the standards set by both *Brecht* and AEDPA. Accordingly, I would reverse the decision of the district court and would remand for issuance of the writ if, within a reasonable time, the State fails to initiate a new trial for Bains.