UNITED STATES of America,
Plaintiff–Appellee,

v.

Ernestine Audry JAMES, a/k/a Ernestine James, Defendant–Appellant.

No. 96–30081.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 19, 1998.

Decided March 9, 1999.

Peter Offenbecher, Assistant Federal Public Defender, Seattle, Washington, for the defendant-appellant.

Andrew R. Hamilton, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

so insubstantial that they do not require further discussion.

Before: Hug, Chief Judge, SCHROEDER, FLETCHER, PREGERSON, BRUNETTI, NOONAN, KLEINFELD, TASHIMA, THOMAS, GRABER, and McKEOWN, Circuit Judges.

Opinion by Judge NOONAN; Dissent by Judge KLEINFELD.

NOONAN, Circuit Judge:

Ernestine Audry James appeals her conviction of aiding and abetting manslaughter within Indian country in violation of 18 U.S.C. §§ 2, 1112, 1153. Holding that the district court erred in excluding relevant evidence corroborating her testimony, we reverse the judgment of conviction.

### FACTS AND PROCEEDINGS [1]

James met her boyfriend, David Ogden (the victim), at a pow-wow in Seattle. He was nice sober, nasty drunk. Ogden had boasted to her about once killing a man and getting away with it. He told her he had sold another man a fake watch, and when the man complained, had stabbed him in the neck with a ball point pen. Ogden told James that "it was pretty funny watching a guy with a pen dangling out of his neck." He also bragged that he had once "ripped a side view mirror off the car and beat a man unconscious with it," and that, in yet another incident, he had robbed an old man by holding him down with a knife in his face and threatening to cut his eyes out.

James had seen Ogden's violence with her own eyes and suffered it. The worst was when Ogden was intoxicated and James refused to have sexual intercourse, so he threw her on the bed and raped her. On another occasion when Ogden wanted to have sexual intercourse with James and she had refused, he came into the room where she and her daughter Jaylene Jeffries were and started yelling at James and calling her names. Jaylene got up and held Ogden at knife point with a carving knife until James ordered them both to desist. Ogden once struck James with a backhanded slap, giving her a swollen lip. Another time, he was drunk and wanted to have sexual intercourse with James, and would not take no for an answer until she broke a glass on the dresser and threatened him with it.

Once in their apartment, Ogden accused a friend of "looking at" James, and when the friend denied it, beat him up. When James and Jaylene told Ogden to stop, he kept kicking and hitting the man, so James tried to dial 911. Ogden ripped the phone out of the wall. There was another phone in the bedroom so James went to that phone and told her daughter to follow her. James had started dialing when Ogden broke the door down, on top of her daughter. James put the phone down, and Jaylene started hitting and kicking Ogden, breaking some of his ribs. James told them both to stop and told Ogden to leave. They both complied.

When James and Ogden would go out for dinner, a few drinks, and window shopping, he would start yelling at strangers and challenging them to fights. Sometimes he and the strangers would fight. James also testified Ogden used to take his knife out of his sock, open and close it, and switch it back and forth between hands as if he were in a fight.

Jaylene, the daughter, had beaten Ogden on three occasions. She testified that "I was the one doing something, but he wasn't." Ogden would never fight back against her. He acted scared of her, even though she was only fourteen.

Ogden hated Jaylene's boyfriend, Michas Tiatano. Ogden, James, and Jaylene were

---

1. The vacated panel opinion set out the basic facts and the relevant trial proceedings with clarity and fairness. With minor emendations and omissions we adopt its statement, acknowledging our debt here but not with quotation marks.

Indian, but Tiatano was part Black and Asian. Ogden hated Black people. On the day Ogden was killed, the four of them had been together at a party. At one point during the party Ogden had lifted a hammer from the carpentry tools he used at his job and said to Tiatano "I ought to hit you with this," but stopped when James told him to "knock it off." Later Ogden started pulling Tiatano around by his shirt and telling him he hated him. Jaylene told Ogden to stop, and he did.

When James decided to leave the party, her van got stuck on a fishnet lying on the ground. She and Jaylene were sitting in the van when Jaylene heard Tiatano say, "Oh man," and fall down. Ogden had just punched Tiatano in the face, possibly with some object in his hand, so hard that he broke his nose and knocked him unconscious. Some other men who were there brought Tiatano into the house and gave him first aid. That incident led to Jaylene killing Ogden. Testifying as a witness for the government, she gave this account:

> Q. Now, when you heard that statement from your mother that Michas [Tiatano] had just gotten hit by David [Ogden], how did you feel?
>
> A. Angry.
>
> Q. What did you do?
>
> A. I got out of the van and started chasing him.
>
> Q. Weren't you afraid that he would harm you?
>
> A. No.
>
> . . .
>
> A. No, I wasn't afraid of him.
>
> Q. You were not afraid of him?
>
> A. No.
>
> . . .
>
> Q. And at the end of the chase, what did you do?

> A. I went over to my mom's side of the van.
>
> Q. Was this on the driver's side?
>
> A. Yeah.
>
> Q. What happened next?
>
> A. My mom had a gun out. She was loading it.
>
> . . .
>
> Q. When you got up to the van, what happened next?
>
> A. She gave me the gun.
>
> Q. Did you ask her for the gun?
>
> A. No.
>
> Q. Did she say anything to you when she handed you the gun?
>
> A. Yes. She said it was on safety.
>
> Q. What else did she say?
>
> A. And this is how you click it off.
>
> Q. And she showed you that?
>
> A. Yeah.
>
> Q. Where was David Ogden at this time?
>
> A. He was still on the road.

Jaylene proceeded to shoot Ogden at point blank range.

On defense counsel's cross-examination, Jaylene acknowledged that perhaps Ogden was not really afraid of her, because he was not afraid of anyone when he was drunk, and if he had really wanted to, he could have beaten her up and hurt her. She also testified, on cross, that her mother had bought the gun because of threats from one of Jaylene's previous boyfriends.

James testified that after Ogden had "cold cocked" Tiatano, Jaylene chased him for awhile. According to James, the following ensued:

> A. Jaylene came—excuse me. Jaylene came back to the van and she was breathing heavy, like she was running. She was very upset and she just started begging

me for the gun. She said, mom, please give me the gun, give me the gun. She said it several times.

Q. And what did you do when she begged you for the gun?

A. I just grabbed for my purse and got the gun and handed it to her.

. . .

Q. At that moment when Jaylene asked you for the gun and you reached in and gave it to her, why did you give it to her?

A. I gave it to her to protect herself and the family members.

Q. What did you expect her to do with the gun when you gave it to her?

A. I just expected her to fend David off. I didn't want her to shoot him. It was just to scare him away from the property.

Q. Why did you want her to scare him away from the property?

A. Because I knew how violent he was and I knew that he wouldn't stop at just one punch and he wanted to continue being violent.

On cross-examination, James testified that as Jaylene was chasing Ogden, Jeffries "just yelled at him that she was going to get him." James denied showing her daughter how to turn the safety off so that the gun would fire.

Defense counsel argued self-defense. He pointed out to the jury that James, his client, was charged with aiding and abetting the daughter by handing her the gun, so James had to be judged by what she knew at the moment, not by the daughter's conduct afterward in killing a man who had raised his hands in surrender. He argued that because the mother knew Ogden was drunk, vicious when drunk, and usually carried a knife in his sock, it was not grossly negligent to give "the gun to her daughter so that Jaylene could protect herself in that one moment when [the mother] had that decision, the split second decision to make."

The jury heard all the evidence discussed above. In the pretrial skirmishing, the court had ruled that James and Jaylene could testify about prior violent misconduct they had known about when James handed Jaylene the gun, but could not introduce extrinsic evidence of which they had no knowledge at that time. This appeal is about four exhibits that the mother's attorney was not allowed to show the jury. He had (1) court documents setting forth detailed findings on the robbery of a 58–year old man, in which Ogden sat on the man and held a knife at his throat and at his eyes while threatening to blind him; (2) a presentence report with 38 priors, some resulting in conviction, some with unknown dispositions; (3) a Seattle police report that Ogden, with his shirt off, was randomly striking people in a crowd on Second Avenue in Seattle, near Pike Place Market; (4) a Seattle police report that, again near Pike Place Market, Ogden and another man grabbed a stranger, threw him down, beat him, and kicked him in the face.

The jury sent out a number of questions during its deliberations. One read as follows:

Dear Judge,

The jury would like to know if it is a "fact" that:

1) Ogden did stab an "old man" and was sentenced to 20 yrs & on parole

2) did he really stab someone with a pen

3) did he really murder a man and hide on an apt?

Are there police or court documents to prove this or is it "brag?"

Thanx.

Robert Reedy

Foreman

The judge declined to supplement the evidence.

The district judge further explained why he had excluded the evidence. In his ruling on defendant's motion for a new trial, he explained that "evidence of every past violent act by Ogden, known to the defendant, was

placed before the jury," as was reputation and opinion evidence as .to Ogden's violent character. The extrinsic evidence was not such evidence, because "the only relevant facts concerning Ogden's past were the ones defendant knew about; only to that extent could her state of mind at the time of the shooting have been affected by Ogden's past misconduct." The district judge noted that if the court records had in fact been to the contrary, and proved that Ogden had been exaggerating and was not really so violent as he claimed, the court would have sustained a defense objection, "because the court record, never seen by defendant, could not have affected her state of mind. The result should be no different when the defendant offers the extraneous record."

James was convicted and sentenced to five years probation. She appealed, and a divided panel of this court affirmed her conviction. 139 F.3d 748. We then took the case en banc.

## ANALYSIS

■ A preliminary question is whether we are conducting a review of the district court's exercise of discretion or a review de novo of an error of law. If the district court's ruling is understood as a determination that any record not known to the defendant is inadmissible as part of a defense based on self-defense, its ruling was one of law, and our review is de novo. If the district court is understood to have implicitly weighed the probative force of the evidence against its prejudicial impact on the jury by making the victim seem odious, then our review is for an abuse of discretion. As both ways of interpreting the district court's action are tenable, we shall review, first, de novo as to law, *United States v. Keiser,* 57 F.3d 847, 852 n. 6 (9th Cir.1995), and, second, review the postulated exercise of discretion.

■ Ernestine Audry James's only defense was that she believed that she and her daughter were in danger of grievous bodily harm or death from Ogden. Essential to that defense was her belief in Ogden's stories

of previous acts of vicious violence committed by him. These stories were of such a remarkable character of atrocity that one might doubt that he had told them of himself or doubt that they had really occurred. Hence the question raised by the jurors as to Ogden's stabbing of an old man; Ogden's stabbing of another person with a pen; and Ogden's murdering a man: "Are there police or court documents to prove this or is it 'brag'?"

For the defense the records, if admitted, would have had two legitimate functions: to corroborate Ernestine James's own testimony that she had heard Ogden tell her these things and to corroborate her statement that she had reason to be afraid of Ogden in his vicious drunken mood.

The district court thought the only function of the evidence would have been to show Ernestine James's state of mind and that, since she had not seen the records, the documents proved nothing as to her state of mind. That interpretation of the proffered evidence was too narrow. It was absolutely necessary to her defense for the jury to believe (1) that she wasn't making up the stories and (2) that, when she heard them, she heard them from the man who had actually done these terrible things and who was not just spinning tales. The records proved that he had done them so that the stories of his wild exploits would have had the ring of truth to her, and the records proved that what Ernestine James testified to had actually taken place. The records corroborated her testimony, and the records corroborated her reason to fear.

■ The law of this circuit is crystal-clear that corroboration of a key prosecution witness by the introduction of criminal records is permissible, even at the risk of some prejudice to the defendant on trial. *United States v. Pitts,* 6 F.3d 1366, 1370–71 (9th Cir.1993). We should not have one rule for the prosecution and another rule for the defense.

The crucial significance of this kind of corroboration has been recognized in a lead-

ing opinion by Judge Skelly Wright, *United States v. Burks*, 470 F.2d 432, 434–35 (D.C.Cir.1972); 2 Wigmore, *Evidence*, §§ 246, 248 (Chadbourn rev.1979). Self-defense is about as basic a moral and legal principle as there is. *See* George P. Fletcher, *Self–Defense As A Justification for Punishment*, 12 Cardozo L.Rev. 859, 859 (1991). A mother's instinct to preserve her child from danger is equally strong, equally a part of that bedrock nature we share with all animals. The records were admissible as relevant under Federal Rules of Evidence. 404(b).

■ Assuming that the district court implicitly weighed the effect of the records and found that their probative force was outweighed by their unfairly prejudicing the jury against the victim, the district court abused its discretion under Rule 403. Ogden's vicious behavior was already before the jury. The records would not have painted him darker than he already must have appeared. The records went to James's credibility not Ogden's character.

Because the crux of James's defense rested on her credibility and because her credibility could be directly corroborated through the excluded documentary evidence, exclusion of the documents was prejudicial and more probably than not affected the verdict.

For the reasons stated, the judgment of the district court is **REVERSED**.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent. My dissent is not based on the notion that the trial judge should have kept the documents out of evidence. He had discretion to go either way, and I might have let them in myself, were I still a trial judge. We must, however, defer to a district judge's discretion, when the trial judge had a sensible reason for exercising his discretion as he did.

Review of decisions on admission of evidence is traditionally for abuse of discretion, whether there are legal issues involved or not. That is because the legal issues are inextricably interwoven with necessarily rough judgments about where the evidence is likely to go and how the jury is likely to use it. I shall not repeat the more complete discussion in the panel opinion, at 139 F.3d 748, 752–754.

Defense counsel had to deal with a problem regarding his self defense theory. The daughter shot an unarmed man who was standing with his hands up, and she testified that she did not fear him. The mother gave her daughter a gun while the daughter was chasing the man. The mother's defense attorney dealt with the problem by reminding the jury that the mother was on trial, not the daughter, and the mother had to be judged by her state of mind, what she knew and thought, at the moment she gave her daughter the gun. The judge accordingly let in every bit of evidence with any bearing on what the mother knew at that moment. All he kept out was what the mother did not then know, that there were papers corroborating what the victim allegedly had said about the vicious things he had done. Because the mother had not known of the papers and had never seen them, the trial judge concluded that the papers could not have had any effect on her state of mind. That makes sense, and I do not think so sensible a decision can properly be characterized as an abuse of discretion.

The majority is correct, that the papers were nevertheless relevant in another sense. Evidence that the victim really had killed a man, and had stabbed another in the throat with a pen, made it more probable that the victim had told the mother that he had done these things. For that reason, it would not have been an abuse of discretion for a judge to have admitted the documents. But admissibility does not suffice to make exclusion an abuse of discretion.

There were good reasons to keep the documents out. The documents were somewhat remote corroboration, not direct evidence of anything relevant. They showed nothing directly about the mother's state of mind, be-

cause she had never seen them. And the risk of unfair prejudice to the prosecution was considerable. The victim was a bad man. Some people would say, in private and out of court, that "he deserved it," or "he needed killing." But no one says such things in a courtroom, because the law does not permit murder, even of very bad people.

The jury's questions—"did he really stab someone with a pen," "Are there police or court documents to prove this or is it 'brag?' "—may mean that the jury was asking the wrong question, whether the victim deserved to be shot. The majority says that the evidence went to the mother's credibility, not the victim's character. But the jury's questions suggest that jurors were wondering whether the victim really did what he claimed, as opposed to whether Ms. James believed him. And the trial judge who, unlike us, was there, may have seen that coming. Plenty of evidence lends itself both to permissible and impermissible uses, and trial judges have to weigh the risks as the trial proceeds.

I concede the possibility that the truth of what the victim allegedly had told the mother gave his remarks the "ring of truth," as the majority suggests. But this is pretty remote. This relevant purpose could be outweighed by the inappropriate purpose to which the jury might put the documents. The defendant was supposed to be on trial, not the victim.

A district judge is supposed to exclude evidence if its probative value "is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. Today's majority opinion says "[w]e should not have one rule for the prosecution and another rule for the defense." Indeed not. Rule 403 does not limit "unfair prejudice" to one side. "Unfair prejudice" means, at its most serious, "an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." McCormick on Evidence § 185 at n. 31 (2d ed.1972); see Fed.R.Evid. 403, 1972 Advisory Committee Note. While a defendant is fully entitled to

prove self defense, a defendant is not entitled to persuade a jury by evidence "justifying the deliberate destruction by private hands of a detested malefactor." II Wigmore on Evidence § 246, at 57.

The majority says that we should stick with *United States v. Pitts*, 6 F.3d 1366 (9th Cir.1993), but has the rule in *Pitts* wrong. We did not hold in that case that any evidence had to be admitted. We held that a trial judge's decision to admit it was not an abuse of discretion. "We review the district court's decisions balancing probative value against prejudicial effect for abuse of discretion." *Pitts* at 1371. The judge in that case, like the judge in this one, sensibly could have kept the evidence out or let it in. The rule is the same for the prosecution and the defense, that a trial judge who makes a discretionary judgment for a sensible reason has the last word on the subject.

Exclusion in the case at bar is like the exclusion we approved in *United States v. Comerford*, 857 F.2d 1323 (9th Cir.1988). There, a victim had previously been arrested for hitting his wife, and we affirmed the trial judge's decision to keep the domestic violence evidence out in an assault trial involving unrelated males. There is also a parallel to *Cohn v. Papke*, 655 F.2d 191 (9th Cir. 1981). A man who had been arrested for soliciting sex from male police officers brought a civil rights suit for police brutality. We held that the trial judge had abused his discretion by admitting the defendants' evidence that the man was homosexual, because the man's sexuality was of limited relevance, and the relevance was outweighed by the risk of unfair prejudice. These decisions— *Pitts*, *Comerford*, and *Cohn*—represent the established law of our circuit, and today's decision deviates.

*United States v. Burks*, 470 F.2d 432, 437 (D.C.Cir.1972), which the majority calls a "leading" opinion, strikes me as an anomaly not deserving to be followed decades later in another circuit. In *Burks*, the victim was late paying the defendant for a truck that he had bought. After they argued about it, the

defendant went to a friend's house, got a gun, and came back and shot his debtor dead. *Burks* held that the killer was entitled to prove that the victim had killed his own six year old son some years earlier, in order to corroborate his self defense claim that he was scared of the man. The possibility that a man would feel that he needed a gun to argue about a debt with a man who had beaten a six year old to death strikes me as pretty unlikely. The trial judge made a reasonable decision in *Burks* that the risk of unfair prejudice, because of any juror's natural feelings about a man who had beaten his six year old son to death, would outweigh the probative value toward showing which man started the deadly confrontation, and it is surprising that it was not affirmed.

The more typical result is the one that the Eighth Circuit reached in *United States v. Driver*, 945 F.2d 1410 (8th Cir.1991). The defendant had shot a man in the head, and wanted to prove that the victim was being investigated for child abuse. He claimed that this evidence would help prove his self defense theory. The Eighth Circuit of course held that the "evidence of the child abuse investigation involving the victim would have served merely to portray him as a bad person, deserving to be shot, but did not relate to Driver's claim of self defense." *Id.* at 1416. We should follow *Driver*, not *Burks*.

We did not try Ms. James's case. When a trial judge makes a sensible decision to admit or exclude evidence, well within the range of what is ordinary, for a sensible reason, as the trial judge did in this case, we should let it alone. Ms. James got a fair trial.