Kelly A. DePETRIS, Petitioner–Appellant,

v.

Lew KUYKENDALL; James Gomez, Respondents–Appellees.

No. 99–56126.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 5, 2000

Filed Jan. 26, 2001

---

Cliff Gardner, San Francisco, California, for the appellant.

Eric D. Share, Deputy Attorney General, San Francisco, California, for the appellee.

Before: BROWNING, NOONAN, and SILVERMAN, Circuit Judges.

Opinion by Judge SILVERMAN; Concurrence and Dissent by Judge NOONAN.

SILVERMAN, Circuit Judge:

Petitioner Kelly DePetris shot and killed her husband Dana DePetris while he was asleep in bed. At trial, she claimed "imperfect self-defense"—that is, she claimed to have had an actual, honest belief that she was in imminent danger even if such a belief was objectively unreasonable. Under California law, imperfect self-defense

is not a complete defense to homicide; however, if established, it negates malice and reduces murder to voluntary manslaughter.

To prove her claim that she acted out of an actual fear that her husband would make good on his threats to kill her and their baby that night, petitioner attempted (1) to offer into evidence Dana's handwritten journal and (2) to testify herself about how having read the journal contributed to her belief that Dana's threats were to be taken seriously. The journal contained Dana's chilling account of his violent behavior toward his first wife and others. The trial court excluded as irrelevant the journal and petitioner's testimony about having read it.[1] Although the California Court of Appeal held that the journal and related testimony were indeed admissible, it held that their exclusion was harmless because the jury had heard other evidence relating to Dana's propensity for domestic violence.

We hold, first, that given the subjective element of imperfect self-defense, the erroneous exclusion of this evidence was not mere evidentiary error. It unconstitutionally interfered with petitioner's due process right to defend against the charges. We also hold that this error very likely had a substantial and injurious effect on the verdict. Petitioner's credibility and state of mind were the central issues in the case. Because of the subjective aspect of imperfect self-defense, the trial court's erroneous preclusion of both the journal and especially petitioner's own testimony about having read it—to explain why she did what she did—was a crucial ruling. None of the other evidence adduced at trial could in any way make up for Kelly DePetris's own testimony about her state of mind, or for Dana DePetris's handwritten corroboration of it. We reverse.

## I. Background

We take the following recitation of facts from the opinion of the California Court of Appeal in which petitioner Kelly DePetris is referred to as "appellant":

Appellant married [Dana] DePetris in November of 1990, after knowing him for seven months. Their child Travis was born in November of 1991. Around that time, appellant's mother divorced her father and DePetris threatened appellant that he would kill her if she ever left him. Incidents of DePetris becoming angry and hitting appellant began in late 1991. At times DePetris yelled profanity at the child. Appellant testified to many instances of threats, physical violence, threats with a gun, and times when DePetris would sneak up on her and point his gun at her head. Appellant did not tell anyone or seek help because she was afraid DePetris would hurt her or take the baby. When she discussed the idea of leaving him, he said "[t]ill death do us part" and threatened to kill her or the child.

Once, when appellant tried to leave with the baby, DePetris took the baby at gunpoint. DePetris told her if she left she would never see the baby again and appellant believed him. Another time when appellate started to leave, DePetris threatened to kill her, made her sit in the closet as punishment, then apologized. The couple's financial problems became worse in late 1993 and 1994, and there were several instances of being late in paying the rent. In April of 1994, DePetris became furious when the landlord talked to him about the overdue rent, and he yelled at the baby and told appellant to find the money. Appellant was able to borrow money to pay the April rent.

In May, the couple was again unable to pay the rent. DePetris wanted appellant to borrow the money so that he

---

1. Petitioner also sought to introduce the portion of her videotaped police interrogation where she told detectives about the journal.

She also attempted to introduce testimony about the journal by an expert on Battered Woman's Syndrome.

could use their paychecks for a trip to the Grand Canyon. The evening of May 10, 1994, DePetris told appellant to find the money by the next morning or he would kill her. DePetris made a threat that the appellant's "clock" was running out, which meant the end of her life. He also said he would plan how to kill her, or to kill the baby, so appellant would have to "live with that for the rest of [her] life." Appellant went to bed that night, but DePetris awakened her later that night, pointed the gun at her head, and said: "[t]ic-toc, tic-toc. You better come out with the money for rent or you are clocking out." Appellant understood this to mean that he would end her life. In the early morning, the dog awakened DePetris and appellant, and DePetris told appellant to take the dog out, stating that he needed his rest so he could "take care" of appellant later. Appellant got up, took the gun, which DePetris always required her to take with her, and went downstairs to let the dog outside. Appellant then went back upstairs to put the gun away, thinking of killing herself, and all of the times DePetris had hit her and yelled at her and the child. She denied making a decision to shoot DePetris, but felt as if she was in a dream, then she heard the gun discharge. She heard him moan, and knew he needed help. As she went to call 911, the gun went off again, and she thought she would tell the police that someone broke in and fired the gun. Paramedics took DePetris to the emergency room, where he died from a shotgun wound to the back of his head.

Police took appellant to the station, where she initially told them that an intruder shot DePetris. Eventually, appellant admitted to the police that she shot DePetris. In her interview, which was admitted into evidence, appellant said that she stood at the bedroom door holding the gun for about a minute, thinking "this is the only way out, it's you know, me or him." She did not aim the gun, or check to see if it was loaded, and she did not want to fire, but thought "it's me or him."

The defense was that appellant was acting under an actual, albeit unreasonable, fear of great bodily harm or death, which is the "imperfect" self-defense of *People v. Flannel* (1979) 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1. At appellant's trial, friends and family members testified about appellant's injuries that resulted from DePetris's beatings. Other witnesses testified that they had not noticed any problems in the relationship. Psychologist Nancy Kaser–Boyd testified as an expert on Battered Woman's Syndrome. She defined a battered woman as one who has suffered physical, sexual, and/or psychological abuse. She explained that battered women feel unsafe, suffer from pervasive anxiety, seldom reveal the abuse to others, and usually fail to leave the relationship. She described a cycle of violence in which the first phase consists of events that build towards violence, the second phase is the explosion of violence, and the third phase is loving contrition and apology. Kaser–Boyd testified that she had evaluated appellant, using police reports, statements, interviews of appellant and her family, and the results of physiological tests of appellant. In her opinion, appellant's test results, personality traits, and conduct were consistent with information received from other battered women.

The jury convicted appellant of first degree murder and use of a firearm. (Pen.Code, §§ 187, 12022.5.)

The prosecution moved in limine to exclude from evidence Dana DePetris's journal and any reference to it. The journal contained Dana's own handwritten description of his physical abuse of his homosexual companion, his beating of his stepdaughter, his rape of a friend's girlfriend, and numerous accounts of his beating of his first wife, including the breaking of her eardrum. The prosecution also sought to preclude petitioner's own testimony about

having read the journal both before and during the marriage, and to its effect on her. In addition, the prosecution sought to exclude the portion of petitioner's videotaped police interview in which, in the course of trying to explain her actions on the morning of the shooting, she mentioned the journal and its effect on her; the prosecution intended to introduce incriminating portions of the tape, but sought to exclude any reference to the journal. Finally, the prosecution sought to limit the testimony of Dr. Nancy Kaser–Boyd, an expert on Battered Woman's Syndrome, to prohibit her from mentioning the journal. The motion in limine was granted. The journal and all references to it were ruled inadmissible.

Petitioner was found guilty of first degree murder with use of a firearm. She was sentenced to twenty-nine years to life in prison. The California Court of Appeal affirmed, holding unanimously that the journal evidence was admissible, but also holding (with one justice dissenting) that the error was not prejudicial in light of other evidence that went to the jury to prove petitioner's credibility and the victim's propensity for violence.

The district court denied habeas relief, holding that the excluded evidence was but "one piece of physical evidence" that was not critical to the defense. Assuming arguendo that constitutional error had occurred, the court held that such error was harmless in light of other evidence that was adduced in support of her theory of defense.

## II.   Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 2253.

■ A district court's decision to grant or deny a petition for writ of habeas corpus is reviewed de novo. *Bribiesca v. Galaza,* 215 F.3d 1015, 1018 (9th Cir.2000). Under the Antiterrorism and Effective Death Penalty Act of 1996, we grant habeas relief only when the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "When analyzing a claim that there has been an unreasonable application of federal law, we must first consider whether the state court erred; only after we have made that determination may we then consider whether any error involved an unreasonable application of controlling law within the meaning of § 2254(d)." *Van Tran v. Lindsey,* 212 F.3d 1143, 1155 (9th Cir.), *cert. denied,* — U.S. —, 121 S.Ct. 340, 148 L.Ed.2d 274 (2000). The latter step is a review for clear error.[2]

■ Further, we apply the *Brecht* standard to determine whether a constitutional error was harmless. Habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Bains v. Cambra,* 204 F.3d 964, 977–78 (9th Cir.) *cert. denied,* — U.S. —, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000).

## III.   Analysis

■ There is no denying that the precluded journal was admissible as a matter of California evidence law. The California Court of Appeal so found and that finding is binding on us. *See Franklin v. Henry,*

---

**2.** In *Van Tran,* we explained the standard set forth in *Williams:*

> [W]e must reverse a state court's decision as involving an "unreasonable application" of clearly established federal law when our independent review of the legal question does not merely allow us ultimately to conclude that the petitioner has the better of two reasonable legal arguments, but rather leaves us with a "firm conviction" that one answer, the one rejected by the court, was correct and the other, the application of federal law that the court adopted, was erroneous—in other words that clear error occurred.

*Van Tran,* 212 F.3d at 1153–54.

122 F.3d 1270, 1273 (9th Cir.1997). The questions then become whether the erroneous exclusion was contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States, and if so, whether the error was also "objectively unreasonable." If the error was "objectively unreasonable," we then inquire whether it had a substantial and injurious effect on the jury's verdict.

### A. Was a constitutional right violated?

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *accord Davis v. Alaska,* 415 U.S. 308, 317, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense. *Chambers,* 410 U.S. at 294, 93 S.Ct. 1038; *Washington,* 388 U.S. at 18–19, 87 S.Ct. 1920.

For example, in *Washington,* the defendant was charged with murder. He admitted being present at the time the victim was shot, but denied shooting him and testified that he tried to persuade the actual shooter—Fuller—to leave the scene before the shooting. The trial court permitted Washington to testify on his own behalf but precluded him from calling Fuller as a corroborating witness. The Supreme Court held that exclusion of this corroborative evidence was unconstitutional even though the defendant himself was allowed to testify. *Washington,* 388 U.S. at 15–17, 22, 87 S.Ct. 1920. The Court stated that the right to offer such evidence "is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Id.* at 19, 87 S.Ct. 1920.

Likewise, in *Chambers* the trial court allowed an eyewitness to testify that he saw someone named McDonald kill the victim, but precluded the defendant from corroborating that testimony with evidence that McDonald had confessed. As it did in *Washington,* the Supreme Court held that exclusion of this critical corroborative evidence was not only erroneous but unconstitutional because it interfered with the defendant's right to defend himself against the state's accusation. *Chambers,* 410 U.S. at 298–302, 93 S.Ct. 1038.

Along the same lines, in *Franklin v. Henry,* 122 F.3d 1270, 1273 (9th Cir.1997), we held that where a defendant's guilt hinges largely on the testimony of a prosecution's witness, the erroneous exclusion of evidence critical to assessing the credibility of that witness violates the Constitution.

■ As these cases illustrate, the trial court's exclusion of Dana DePetris's journal and petitioner's testimony about having read it was not mere evidentiary error. It was of constitutional dimension. The ruling went to the heart of the defense. Petitioner's sole defense was that she killed her husband in an honest belief that she needed to do so to save her life. The success of the defense depended almost entirely on the jury's believing petitioner's testimony about her state of mind at the time of the shooting. As the prosecutor argued in closing argument, to "accept the position of the defense, you must accept what [petitioner] has said to you in this trial. * * * [T]o find voluntary manslaughter, you have to find that [petitioner] is being honest with you." There is simply no denying that the most important witness in the defense of Kelly DePetris was Kelly DePetris herself. The trial court not only excluded the journal, which would have corroborated petitioner's testimony, but worse still, it prevented petitioner from testifying fully in her own behalf about why she did what she did— this in a case where proof of the defen-

dant's state of mind was an essential element of the defense.

With all due respect, the district court's ruling that the erroneous exclusion of the journal evidence was not of constitutional magnitude reveals a misunderstanding of its true significance. The district court characterized the trial court's ruling as the exclusion of only "one piece of physical evidence." In describing the trial court's ruling that way, the district court failed to take into account that the overriding significance of the proffered evidence was not so much the journal itself as petitioner's own testimony about how having read the journal influenced her assessment of the danger she perceived. It also must be remembered that the trial judge excluded not only the journal, but *also* petitioner's trial testimony about it, *and* the portion of the videotape of the police interrogation where petitioner mentions it, *and* any reference to it by the expert on Battered Woman's Syndrome. It was not just "one piece of physical evidence" that was excluded.

■ The trial court precluded petitioner from testifying fully about her state of mind and from presenting evidence that would have corroborated her testimony. Because this evidence was critical to her ability to defend against the charge, we hold that the exclusion of this evidence violated petitioner's clearly established constitutional right to due process of law— the right to present a valid defense as established by the Supreme Court in *Chambers* and *Washington.* Further, based on the foregoing independent review of the record, we find that the state court's error was also objectively unreasonable. *See Delgado v. Lewis,* 223 F.3d 976, 981–82 (9th Cir.2000).

B. Did the error have a substantial and injurious effect on the verdict?

The petitioner has shown that the erroneous exclusion of the journal evidence likely had a substantial and injurious effect on the verdict, as required by *Brecht,* for the following reasons:

■ First, petitioner's state of mind was the critical issue at trial. The case would rise or fall on whether the jury would believe that petitioner acted in actual fear of imminent harm from her husband when she shot him, yet petitioner was prevented from testifying fully about why she feared him so. It is no answer to say that the record contained other evidence of the husband's violence. Her state of mind was uniquely within her knowledge, and as California Court of Appeal Justice Swager wrote in dissent,

> [i]t was the *sum* of her perceived threats to her safety and her child's safety, the victim's past conduct towards [petitioner] *and* [petitioner's] knowledge of the journal entries that constituted her state of mind. One cannot be severed from the others without depriving the jury of its ability to make a decision based upon "all of the circumstances known to the defendant."

*People v. DePetris,* No. A071092, slip op. at 18 (Cal.App.Ct. Nov. 20, 1996)(emphasis added).

Second, proof of petitioner's credibility was crucial to her defense. As already noted, the prosecutor's closing argument dramatically underscored the importance of petitioner's credibility. The prosecutor strenuously argued that the only way the jury could acquit petitioner of murder and convict her of manslaughter was if it somehow believed her claim of actual fear. To establish imperfect self defense, it was absolutely essential that petitioner prove her credibility. The journal was powerfully and indisputably probative of this point. The journal corroborated—in Dana DePetris's own handwriting—petitioner's testimony that her fear had a genuine basis in fact.

Third, although it is true that the jury heard testimony from other people about the husband's violence, this other testimony came from witnesses aligned with the petitioner—her parents, half-sister, and a friend. "[T]he excluded evidence, unlike the evidence [from petitioner's family and

friends] was not subject to attack on the grounds of bias or self-interest. It was the only unbiased source of corroboration for [petitioner's] testimony." *People v. DePetris,* No. A071092, slip op. at 20 (Cal. App.Ct. Nov. 20, 1996) (Swager, J., dissenting). Indeed, it was from the victim himself.

*United States v. James,* 169 F.3d 1210 (9th Cir.1999), is instructive on the critical importance of corroboration in a self-defense case. In *James,* the defendant's only defense to homicide was that she believed herself to be in danger of grievous bodily harm or death from the victim. Essential to her defense was her knowledge of, and belief in, the decedent's bizarre accounts of previous acts of vicious violence he had committed. These stories were so atrocious that one might doubt that someone would really tell them of himself. The trial judge excluded court and police records that would have corroborated the defendant's testimony that she had heard the decedent tell her those things and, therefore, that she had reason to be afraid of him. On appeal, Judge Noonan wrote for our en banc court:

> The crucial significance of this kind of corroboration has been recognized in a leading opinion by Judge Skelly Wright, *United States v. Burks,* 470 F.2d 432, 434–35 (D.C.Cir.1972); 2 Wigmore Evidence, §§ 246, 248 (Chadbourn Rev. 1979). Self-defense is about as basic a moral and legal principle as there is.
>
> * * *
>
> Because the crux of [the defendant's] defense rested on her credibility and because her credibility could be directly corroborated through the excluded documentary evidence, exclusion of the documents was prejudicial and more probably than not affected the verdict.

169 F.3d at 1214–15.

Such is the case here.

The dissent argues that the exclusion of the corroboration was harmless because "[t]here was no testimony of a fear of imminent peril to be corroborated." Dis-

sent at 1198. That is not correct. Petitioner testified that before they went to bed, Dana threatened to kill her and her son if she did not have the rent in the morning. He awakened in the middle of the night and again told her that she was "clocking out" if she didn't come up with the rent. In the morning, awakened by the dog, Dana ordered her to get her "fuck ass" out of the bed and let the dog out. He then told her that he would "take care of [her] later." She testified that as she stood in the bedroom moments later, after letting out the dog, just before the shooting, she thought to herself, "It's the only way out. It's him or me." This testimony was evidence of her fear of imminent harm. The excluded journal evidence would have corroborated her testimony about why she believed that harm was imminent and that shooting him provided the only avenue of escape. Although the unreasonableness of that belief disqualifies the petitioner from ordinary self-defense, the *actuality* of that belief, if true, entitles her to imperfect self-defense.

As recently explained by the California Court of Appeal in *People v. McCoy, petition for review granted,* 98 Cal.Rptr.2d 430, 4 P.3d 264 (Cal.2000):

> Imperfect self-defense (also called unreasonable self-defense) applies when the defendant actually believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and actually believes the acts which cause the victim's death are necessary to avert the threat, but these beliefs are objectively unreasonable.
>
> . . .
>
> McCoy [the defendant] attacks the definition of imminent peril contained in the imperfect self-defense instruction used in this case. He argues that, by adding the requirement that the peril against which the defendant has acted must appear imminent to the slayer "as a reasonable person," the instruction improp-

erly injected an objective standard into what is a subjective test.

. . .

We must agree with McCoy that to require that the danger appear to be imminent to the defendant "as a reasonable person" directly contradicts the principle of imperfect, or unreasonable, self-defense, which requires only that the defendant have acted in an actual fear of imminent harm, not in fear of imminent harm which would appear to be such to a reasonable person.

*Id.* (internal citations omitted).

### IV.  CONCLUSION

We hold that the erroneous exclusion of both the journal evidence and any reference to it—especially petitioner's own testimony about it—unconstitutionally interfered with her ability to defend against the charges against her.  The preclusion of this highly probative evidence went to the crux of the case, and the harm caused by its exclusion was not cured by the receipt of other evidence that was significantly less compelling.  Petitioner has shown that her trial was substantially and injuriously affected by the erroneous ruling, and therefore, the writ of habeas corpus should have been granted.  We REVERSE AND REMAND for further proceedings consistent with this opinion.

NOONAN, Circuit Judge, concurring and dissenting:

Quintessentially, this kind of case is designed for a jury applying the law of homicide of the jurisdiction.  No issue of racial bias or gender bias or lack of competent counsel is presented.  It was late in the appellate process that diligent counsel even glimpsed the possibility of federal relief.  I concur in the judgment that a federal issue was preserved.

According to Kelly DePetris's own testimony, she picked up Dana DePetris's loaded gun from the bedroom table and took it with her for protection when she went downstairs to let the dog out about 5:15 A.M.  She returned upstairs carrying the gun, "thinking of all the times he hit me, yelled at me and the baby, yelled at him, and our bills, and that he was serious and was going to kill me."  When she got to the top of the stairs, before entering the bedroom, she removed the safety from the gun.  She entered the bedroom, and the gun in her hand went off.

She did not testify that she shot Dana DePetris because she was afraid he would rise and harm her.  She was asked, "When you got to the top of the stairs, do you remember making a decision to shoot the gun?"  She answered, "No. I would never hurt him in a million years.  I would never do that."

After she had testified to her memory of what she presented as happening "in a dream," her counsel asked, "As you were holding the gun, Mrs. DePetris, did you think to yourself, 'It's the only way out. It's him or me.'  Do you remember?"  She answered, "I remember thinking, yes."

The judge who tried the case, two of the three members of the state Court of Appeal, who reviewed the trial record, the Supreme Court of California, and the federal district judge who heard the petitioner, found no fatal error in DePetris's conviction.  The difference between these judges and those accepting DePetris's position is chiefly a difference over what California law required DePetris to prove if she were to reduce her crime from murder to manslaughter.

What DePetris had to prove was not that she was in fear of retaliation or fear of killing later in the morning by a mate she knew to be violently abusive.  What she had to prove was succinctly set out by the Supreme Court of California, expounding the doctrine of imperfect self-defense and cautioning that the doctrine

> . . . is narrow.  It requires without exception that the defendant must have had an actual belief in the need for self-defense.  We also emphasize what should be obvious.  Fear of future harm-no matter how great the fear and

no matter how great the likelihood of the harm-will not suffice. The defendant's fear must be of imminent danger to life or great bodily injury. "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. An imminent peril is one that, from appearances, must be instantly dealt with."

*In re Christian S.,* 7 Cal.4th 768, 782, 30 Cal.Rptr.2d 33, 872 P.2d 574 (1994) (internal citations omitted). At the moment she inflicted death, DePetris had to believe she would then at that moment be killed if she did not kill first.

DePetris offered not a word of testimony that she felt herself, reasonably or unreasonably, in imminent peril from her husband. It is uncertain whether he was asleep at the moment of shooting; her testimony varied on that point; the state Court of Appeal assumed that he was awake. Her only testimony to any movement by him was that he moved and called out after he was shot. As she was outside the bedroom where he lay when she prepared the gun for action by removing the safety, she was, by her own testimony, in no imminent danger from Dana.

The trial judge excluded certain defense evidence. Error in the ruling is identified on appellate review. What becomes the federal question, the constitutional question, the decisive question is whether the exclusion substantially prejudiced the defense. To answer that question requires a judge to perform what is sometimes, but not here, a difficult psychological feat—to put himself in the shoes of a juror who had heard the admissible evidence and to determine what impact the excluded evidence would have had on such a juror's mind. The answer is not difficult here because California law says what DePetris had to prove and the excluded evidence would not have proved it.

The issue was *not* whether the jury would believe that petitioner was in actual fear of her husband. She testified that she was in such fear. DePetris even testified as to her fear of death in the near future at the hands of the husband she shot as he lay on his face in their bed. The jury could have believed every word she said. Her testimony did not establish a defense recognized under California law. She never testified that she believed herself in imminent peril from Dana DePetris. There was no testimony of a fear of imminent peril to be corroborated. DePetris's reading of the journal could in no way have caused the jury to believe that at the moment of the killing she thought her husband was about to kill her. DePetris herself, the only person to know what happened, testified to nothing of the sort.

Our court fastens not on her words but on the words of her counsel in order to contend that she had a belief of being in imminent danger. Counsel was conscious that was a possible defense; DePetris doesn't seem to have realized it. She responded to her counsel's suggestion ambiguously as to whether she was thinking these words or just thinking. Counsel did not clear up the ambiguity. But the ambiguity is cleared up by looking at her testimony as a whole. The thought "him or me" was contrary to her explicit testimony that she made no decision to shoot him, contrary to her testimony that she felt she was in a dream, contrary to her testimony that the gun just went off without her aiming at her husband and pulling the trigger. Every word of her explicit testimony contradicts her counsel's attempt to lead her into saying that she shot her husband because she believed herself in imminent danger from him.

As the prosecutor argued to the jury:

In the end, to accept the position of the defense, you must accept what she has said to you at this trial. And even accepting that, nowhere, anywhere, is there anything that she says that meets the standards.... [T]he definition of imminency is something that has to be instantly dealt with because of the danger that is present, because, at the very time of the shooting, there is a danger of

death, of great bodily injury at that time.

And that didn't exist by her own words.

No challenge is made by DePetris that the jury was not properly instructed on imperfect self-defense as it is understood in California law. The standard California instruction on the subject reads:

A person, who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief.

Such an actual but unreasonable belief is not a defense to the crime of [voluntary] [or] [involuntary] manslaughter.

As used in this instruction, an "imminent" [peril] [or] [danger] means one that is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer.

However, this principle is not available, and malice aforethought is not negated if the defendant by [his] [or] [her] [unlawful] [or] [wrongful] conduct created the circumstance which legally justified [his] [or] [her] adversary's [use of force], [attack] [or] [pursuit].

California Jury Instructions, Criminal § 5.17 (6th ed.1996).

Nothing in the excluded evidence showed that DePetris, reasonably or unreasonably, believed that her husband, prone on the bed, presented a peril that was "apparent, present, and immediate." There was plenty of evidence leading to a belief that he would be a threat when he was up and had the gun, not a scintilla of evidence that a belief of imminent peril was formed at the moment DePetris fired. The court misconstrues California law in finding the excluded evidence corroborative.

No federal law determined by the United States Supreme Court holds the exclusion of peripheral evidence must constitute a denial of due process. If there were such a case, it would have been cited by the petitioner and by the judges who have been persuaded by her argument. No such citation has been offered or exists. The court makes new law in assuming that harm was done here and concluding that it is unacceptable under the federal constitution. Innovative constitutional jurisprudence by this court may be praiseworthy or open to criticism. In the context of habeas corpus it is not lawful.

It cannot be said that the exclusion of the evidence "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Bains v. Cambra,* 204 F.3d 964, 977–78 (9th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000).

We disobey the statute governing our jurisdiction to grant habeas corpus when, in the absence of any disregard of "clearly established Federal law, as determined by the Supreme Court of the United States," we grant the petition.