In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 07-2901

ERIC SMILEY,

*Petitioner-Appellee*,

*v.*

MICHAEL THURMER, Warden,

*Respondent-Appellant*.

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 656—**Lynn Adelman,** *Judge.*

———————

ARGUED APRIL 17, 2008—DECIDED SEPTEMBER 5, 2008

———————

Before RIPPLE, MANION and TINDER, *Circuit Judges*.

RIPPLE, *Circuit Judge*.  Eric Smiley was convicted of first degree intentional homicide, in violation of Wisconsin Statutes §§ 940.01(1), 939.63(1)(A) (1997). The Court of Appeals of Wisconsin affirmed his conviction and sentence on direct review, and Mr. Smiley exhausted his state habeas remedies. Mr. Smiley then filed in the district court a petition under 28 U.S.C. § 2254 for a writ of

habeas corpus. The district court granted the writ. The State of Wisconsin (the "State"), through Warden Michael Thurmer, timely filed a notice of appeal.

For the reasons set forth in this opinion, we affirm the judgment of the district court.


# I

# BACKGROUND

## A. Facts

Mr. Smiley lived with his grandmother, his sister, Monica Walters, and Walters' boyfriend, Christopher Garrett. On the morning of June 6, 1997, Walters discovered the dead body of Garrett blocking the front door. She called the police, who initially believed that Garrett had been the victim of a burglary homicide; they surmised that Garrett had been shot five times and that the shooting had occurred around midnight. After the police spoke with Walters and with her grandmother, they expressed an interest in speaking with Mr. Smiley. The police claim that they were interested in speaking with Mr. Smiley because he lived in the home with Garrett, not because he was a suspect.

Upon discovering that they wanted to speak with him, Mr. Smiley telephoned the police. The police told him to remain at his location, and they immediately dispatched three squad cars to pick him up. According to Mr. Smiley, the police arrived within five minutes of his phone call. The police discovered that Mr. Smiley had an outstanding

municipal court warrant, and they formally arrested him based on that outstanding warrant. Mr. Smiley explains, however, that they did not inform him of the reason for his arrest.

### 1. The First Statement

After arresting Mr. Smiley, the police locked him in a holding cell in the police station. At about 5:00 p.m., the detectives investigating the Garrett shooting escorted Mr. Smiley from the holding cell to an interview room. The detectives told him that, although he was not a suspect, they wanted to question him about Garrett's shooting. It is undisputed that the detectives did not give Mr. Smiley a *Miranda*[1] warning at this time.

The detectives had noticed that Mr. Smiley had a "significant" and "very noticeable" limp, R.15, Ex. W at 70, and they asked him about it; Mr. Smiley stated that he had tripped the previous day and injured his knee. The detectives also noticed an abrasion on his forehead and another on his left hand. When asked about these injuries, Mr. Smiley said that he did not know how he had acquired them.

The police questioned Mr. Smiley about Garrett's shooting. Mr. Smiley denied any knowledge of the shooting, but he related that burglars had broken into his grandmother's home on several occasions. Mr. Smiley further said that Garrett had not mentioned having problems

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

with anyone. Mr. Smiley also told the officers that he did not know of anyone who would want to harm Garrett. Mr. Smiley claimed that he had spent the night at a friend's house. He explained that he had last spoken to Garrett the previous afternoon and that he did not learn about the shooting until sometime after 1:00 p.m. the next day, June 6. He denied owning a handgun, and he stated that he had not handled a gun since his arrest on a weapons charge in Chicago six years earlier.

On several occasions, Mr. Smiley attempted to rise from his chair; each time the detectives ordered him to sit down. After about seventy-five minutes of questioning, the detectives left the interview room for a few minutes. Upon returning, they noticed that Mr. Smiley had what appeared to be blood on his jacket and boots. The detectives asked Mr. Smiley about it, and he explained that his girlfriend had given him the jacket and that, if there was blood on it or on his boots, he had no idea how it had gotten there. The detectives asked Mr. Smiley to remove the articles so that they could test them for blood. At some point, the detectives also had Mr. Smiley remove his clothes and gave him a white coverall to wear. At this point, the detectives observed a bite mark on his back; Mr. Smiley denied knowing how it had happened.

The detectives exited the room with his jacket and boots. Upon returning, they told Mr. Smiley that they had found blood on the articles, and they demanded to know where it had come from. Again, Mr. Smiley said that he did not know how the blood had gotten there. The detectives told Mr. Smiley that they knew that he was lying because

the blood was Garrett's and that they therefore knew that he had killed Garrett. Mr. Smiley nevertheless continued to deny any involvement in Garrett's death, but he began to cry. At approximately 8:00 p.m., the detectives told Mr. Smiley that he was under arrest for the Garrett homicide; they left him alone in the interview room for the next four to five hours (except for the taking of additional photographs). The detectives still did not give Mr. Smiley a *Miranda* warning.

### 2. The Second Statement

At 12:45 a.m., the detectives returned to the interview room and, for the first time, informed Mr. Smiley of his *Miranda* rights. Soon thereafter, Mr. Smiley confessed to having killed Garrett in self-defense.

In his confession, Mr. Smiley told the detectives that he had not socialized with Garrett and, although he did not know very much about Garrett, he thought that Garrett had treated his sister well. Several months ago, Mr. Smiley explained, some items had gone missing in the house, including jewelry, money and a .22 caliber handgun that Mr. Smiley owned. Mr. Smiley subsequently purchased another gun, a .38 caliber, to replace the missing one. Mr. Smiley suspected that Garrett might have stolen these items, although he had never confronted Garrett or voiced his concerns to his sister.

Mr. Smiley stated that, on June 5, he went into the bedroom that Walters shared with Garrett and saw the stolen gun, fully loaded. He took the gun, went into the

living room and laid it on an end table. Mr. Smiley told Garrett, "I found my gun, now where is my diamond ring," referring to a ring that he suspected that Garrett had stolen. R.15, Ex. W at 44. Mr. Smiley recounted that Garrett then told him, "I don't know nothing about your ring." *Id.* At this point, Mr. Smiley and Garrett both became angry; Garrett pushed Mr. Smiley, and Mr. Smiley hit Garrett back. A struggle ensued, and, according to Mr. Smiley, the 260-pound Garrett managed to get him in a bear hug around the top part of Mr. Smiley's back that bent Mr. Smiley over in a forward position. Garrett swung Mr. Smiley around, a maneuver that resulted in Mr. Smiley's injured knee. Garrett also bit Mr. Smiley in the back. Mr. Smiley explained to the detectives that he could not breathe and began to fear that he would pass out. Mr. Smiley reached for a .38 caliber handgun tucked into his waistband and fired it into Garrett's left leg. Garrett released Mr. Smiley and stumbled backward.

After taking a few steps backward, however, Garrett lunged for the .38 caliber gun that Mr. Smiley was holding. Mr. Smiley fired two additional shots at Garrett, who again fell backward. Mr. Smiley then saw Garrett attempt to reach the .22 caliber handgun that was still on the end table. Mr. Smiley claimed that, when he saw Garrett working the slide action of the handgun to chamber a round, he believed that Garrett was going to kill him. As Garrett turned toward him, Mr. Smiley fired two final shots at Garrett. Mr. Smiley claimed that, when he realized that Garrett was dead, he panicked. He moved some items in the residence to create the appearance of a burglary gone bad, grabbed both weapons and left.

At approximately 4:00 a.m., after Mr. Smiley had finished telling the detectives what had happened, he led them to the weapons, which he had hidden in a friend's basement.

## B. Prior Proceedings

The State charged Mr. Smiley with first-degree intentional homicide while armed, in violation of Wisconsin Statutes §§ 940.01(1), 939.63(1)(A) (1997). Prior to trial, Mr. Smiley moved to suppress his first statement. In ruling on the motion, the trial court determined that Mr. Smiley had not been given a *Miranda* warning preceding the interrogation leading up to the first statement; the court further determined that Mr. Smiley was in custody when he had made that statement. The court nevertheless denied Mr. Smiley's motion because it determined that he had been questioned as a witness, not as a suspect. Accordingly, the trial court allowed the State to admit in its case-in-chief all of the statements made by Mr. Smiley during *both* interrogations.

Mr. Smiley's defense at trial was that he had shot Garrett in self-defense. Although Mr. Smiley did not testify at trial, he based his defense on his second statement to the detectives in which he had described the struggle between himself and Garrett.[2] Throughout the trial, how-

---

[2] Both of Mr. Smiley's statements were admitted as a result of the State's proffer in the State's case-in-chief. Neither the
(continued...)

ever, the prosecutor relied heavily on Mr. Smiley's first statement to depict Mr. Smiley as a liar and to argue that Mr. Smiley's story about acting in self-defense could not be believed.

After the close of evidence, the trial court instructed the jury on first-degree intentional murder and, over Mr. Smiley's objection, on the lesser included offense of second-degree intentional homicide—imperfect self-defense.[3] During deliberations, the jury asked the trial court to explain the difference between first and second-degree intentional homicide. The jury convicted Mr. Smiley of the former. The trial court sentenced Mr. Smiley to life in prison with eligibility for parole after forty years.

---

[2] (...continued)
State nor the state appellate court has suggested, at any point in the proceedings, that Mr. Smiley's reliance on the second statement to raise the defense of self-defense affords, under the circumstances here, an independent basis for the admission of the first statement for purposes of impeachment. The position of the State authorities in this respect seems to rest on a solid ground. The Supreme Court has limited the impeachment exception to *Miranda*, first articulated in *Harris v. New York*, 401 U.S. 222 (1971), to situations in which the defendant elects to testify at trial. *See Oregon v. Hass*, 420 U.S. 714, 716, 720-24 (1975); *United States v. Havens*, 446 U.S. 620, 626-27 (1980); *see also James v. Illinois*, 493 U.S. 305 (1990).

[3] Wis. Stat. § 940.01(2)(b) ("Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreasonable.").

The Court of Appeals of Wisconsin affirmed Mr. Smiley's conviction on direct review, and the trial court and court of appeals denied his petitions for state habeas review. The Supreme Court of Wisconsin denied Mr. Smiley's petitions on direct and collateral review. In all proceedings, Mr. Smiley challenged, inter alia, the trial court's denial of his pre-trial motion to suppress his first statement to the police.

While his state habeas proceedings were pending, Mr. Smiley filed in the district court a petition under 28 U.S.C. § 2254 seeking a writ of habeas corpus. The district court stayed the proceedings until Mr. Smiley had exhausted his state remedies. After he had done so, Mr. Smiley returned to the district court and moved for leave to amend his previously filed petition. The district court permitted the amendment, and, in his amended petition, Mr. Smiley claimed that the Court of Appeals of Wisconsin had erred by (1) refusing to suppress a statement allegedly obtained by the police in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny; (2) rejecting his claim that the jury instruction concerning mitigation of the first-degree intentional homicide based on the use of unnecessary force violated his right to due process; and (3) dismissing his ineffective assistance of trial counsel claim.

The district court granted Mr. Smiley's petition. It held that the state court had been confronted with a set of facts materially indistinguishable from those in *Miranda*, 384 U.S. 436, and *Mathis v. United States*, 391 U.S. 1 (1968), but nevertheless arrived at a contrary result. The district court

further determined that this error was not harmless because Mr. Smiley's credibility was a critical issue in the case and because the prosecutor repeatedly had used Mr. Smiley's first statement to depict Mr. Smiley as a liar.

The State timely appealed the judgment of the district court.

## II

## DISCUSSION

### A. Standards of Review

We review de novo a district court's grant of a petition for a writ of habeas corpus. *Ben-Yisrayl v. Davis*, 431 F.3d 1043, 1047 (7th Cir. 2005). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), federal courts may grant a state prisoner habeas relief only if the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The relevant state court decision is that of the last state court to address the habeas petitioner's arguments on the merits, *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006), which in this case is the decision of the Court of Appeals of Wisconsin.

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Terry Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court's decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* A decision also may fall within the "unreasonable application" clause if it "either unreasonably extends a legal principle" from existing Supreme Court precedent "to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. The Supreme Court has cautioned, however, that habeas relief may not issue unless the state court decision was incorrect *and* unreasonable. *Terry Williams*, 529 U.S. at 411; *Horton v. Litscher*, 427 F.3d 498, 504 (7th Cir. 2005).

The state court's factual findings are presumed correct; this presumption can be rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 348 (2003); *Barrow v. Uchtman*, 398 F.3d 597, 603 (7th Cir. 2005). With these principles in mind, we turn to the decision of the Court of Appeals of Wisconsin and the State's arguments.

## B. The Detectives' Failure to Give Mr. Smiley a *Miranda* Warning

The detectives gave Mr. Smiley a *Miranda* warning prior to his second statement, in which he confessed to having killed Garrett in self-defense. Therefore, we confine our review to Mr. Smiley's first statement in which he denied repeatedly any involvement in the crime.[4]

In affirming the trial court's denial of Mr. Smiley's motion to suppress his first statement, the state court of appeals relied on *State v. Armstrong*, 588 N.W.2d 606 (Wis. 1999), a decision of the Supreme Court of Wisconsin. *Armstrong*, in turn, relied upon the Supreme Court's decision in *Rhode Island v. Innis*, 446 U.S. 291 (1980). Under *Armstrong*, the court of appeals explained, "questioning without *Miranda* warnings is lawful when police have 'no reason to know that their questions would likely elicit an incriminating response.'" R.8, Ex. E at 4 (quoting *Armstrong*, 588 N.W.2d at 617). The detectives' questioning of Mr. Smiley between 5:00 p.m. and 8:00 p.m., the time during which he gave his first statement, "was not an interrogation," according to the state court of appeals, "but simply an interview of a potential witness who police believed may have had pertinent background informa-

---

[4] Exculpatory statements fall within *Miranda*'s ambit. *Miranda*, 384 U.S. at 444 (holding that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant" unless the defendant is given warnings designed to safeguard his Fifth Amendment rights against self-incrimination).

tion to the investigation because he was a tenant in the home where the homicide occurred." *Id.* at 4-5. It was not until 12:45 a.m., after the police had noticed the blood on his boots and jacket and took his clothing for laboratory analysis, that Mr. Smiley became a suspect in Garrett's murder. At that point, the detectives ceased the interview, placed him under arrest for the Garrett murder and administered a *Miranda* warning.

The State submits that the court of appeals' decision was proper under the Supreme Court's decision in *Innis*. It reads *Innis* as *limiting Miranda* to situations in which the officers conducting a custodial interrogation might reasonably expect the person under interrogation to make an incriminating statement. Therefore, according to the State: "It is simply not an unreasonable application of *Innis* to find that because the police had no reason to know that their interview would elicit an incriminating response, Smiley's first statement was admissible." Appellant's Br. at 24.

We respectfully believe that the State's submission, as well as the decision of the Court of Appeals of Wisconsin, is predicated on an erroneous reading of *Innis*. In *Innis*, the police arrested Thomas Innis for the murder of a Rhode Island taxicab driver. Upon arresting Innis, an officer issued a *Miranda* warning; Innis stated that he understood his rights and that he wanted to speak with a lawyer. While en route to the police station, one of the officers told the other officer that he hoped that one of the handicapped children from a nearby school did not find the shotgun used in the murder. The other officer re-

sponded that it would be sad if a girl found the gun and perhaps killed herself. Innis interrupted the conversation, and he told the officers that he would lead them to the murder weapon.

The Supreme Court refused to "construe the *Miranda* opinion so narrowly" as applying "only to those police interrogation practices that involve express questioning of a defendant while in custody." *Innis*, 446 U.S. at 298-99. It reiterated that the "concern of the Court in *Miranda* was that the interrogation environment created by the interplay of interrogation and custody would subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination." *Id.* at 299 (internal quotation marks and citation omitted). The Court further explained that the "police practices that evoked this concern [in *Miranda*] included several that did not involve express questioning." *Id.* Accordingly, the Supreme Court held:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected *to either express questioning or its functional equivalent*. That is to say, the term "interrogation" under *Miranda* refers *not only to express questioning, but also* to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.* This focus reflects the fact that the *Miranda*

> safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

*Id.* at 301-02 (emphases supplied) (footnotes omitted).

It is clear from the language, facts and context of *Innis*, that the Supreme Court defined interrogation as (1) express questioning; or (2) its functional equivalent; it defined the latter as any statements that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. Thus, as the district court explained, *Innis* does nothing more than define when police practices, *other than express questioning*, constitute interrogation.

The Supreme Court of the United States has made it clear that, when an individual is subject to custodial interrogation, the fact that the custody was initiated for a reason other than the subject matter of the interrogation does not alter the necessity of warning the individual of his right to silence and to the assistance of counsel. As Justice Black wrote for the Court in *Mathis v. United States*, 391 U.S. 1, 4-5 (1968):

There is no substance to such a distinction, and in effect it goes against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights.

Indeed, *Miranda* itself specifically says that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody." *Miranda*, 384 U.S. at 444 (footnote omitted). Again in *Beckwith v. United States*, 425 U.S. 341 (1976), the Supreme Court stressed that it was the inherently coercive nature of the custodial setting, not the strength or content of the Government's suspicions, that triggered the need for *Miranda* warnings. *Id.* at 346-47. Moreover, both *Miranda* and *Innis* specifically note that the holding of *Miranda* applies both to incriminating and exculpatory statements. *Innis*, 446 U.S. at 302 n.5; *Miranda*, 384 U.S. at 476-77.

It is undisputed that Mr. Smiley was "in custody"—he had been formally arrested—and it is further undisputed that, for three hours, he was subjected to *express* questioning about the Garrett shooting. The State does not dispute that Mr. Smiley's exculpatory statements were given in response to the detectives' express questioning. Because Mr. Smiley was in custody and was subject to *express* questioning, the state court of appeals had no reason to apply the rule for "the functional equivalent" of express questioning. *See, e.g., United States v. Montgomery*, 714 F.2d 201, 202 (1st Cir. 1983) ("Appellant made incriminating statements only after agent Sherman had interjected questions. . . . Since the questioning here was

express, we have no occasion to go farther. This was custodial interrogation."). Consequently, the decision of the court of appeals was an "unreasonable application of" clearly established Supreme Court precedent because it "unreasonably extend[ed] a legal principle from [Supreme Court] precedent to a new context where it should not [have] appl[ied]." *Malinowski v. Smith*, 509 F.3d 328, 335 (7th Cir. 2007) (second alteration in original).

Mr. Smiley was in custody when the police subjected him to extensive questioning about the Garrett murder. Under these circumstances, clearly established Supreme Court precedent required that the detectives inform Mr. Smiley about his *Miranda* rights. *See Mathis*, 391 U.S. at 4 (refusing "to narrow the scope of the *Miranda* holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation"); *see also Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (explaining that, "in determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a '*formal arrest* or restraint on freedom of movement' of the degree associated with a formal arrest'" (emphasis supplied) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)))); *Miranda*, 384 U.S. at 444. Because the detectives failed to administer a *Miranda* warning at the beginning of the first custodial interrogation, all of the statements made by Mr. Smiley during that interrogation should have been suppressed. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) ("*Miranda* conditioned the admissibility at trial of

any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." (footnote omitted)). Accordingly, we must conclude, respectfully, that the decision of the state court of appeals constitutes an unreasonable application of clearly established Supreme Court precedent.

## C. Harmless Error Analysis

The state court of appeals did not address the harmless error issue. Therefore, there is no state court holding to which we owe deference.[5] Under these circumstances, we must apply the "*Brecht* standard of actual prejudice." *Fry v. Pliler*, 127 S. Ct. 2321, 2326-27 (2007). To affirm the district court's grant of habeas relief under the *Brecht* standard, we must determine that the *Miranda* violation had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (adopting a standard first announced in *Kotteakos v. United States*, 328 U.S. 750, 764-65

---

[5]  *Cf. Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam) ("We may not grant respondent's habeas petition, however, if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the Ohio Court of Appeals applied harmless-error review in an 'objectively unreasonable' manner."); *Ben-Yisrayl v. Davis*, 431 F.3d 1043, 1052 (7th Cir. 2005).

(1946)).[6] If a reviewing court is "in grave doubt about whether or not that error is harmless," the Justices have explained, then that court "should treat the error . . . as if it had a 'substantial and injurious effect or influence' " on the jury's verdict. *O'Neil v. McAninch*, 513 U.S. 432, 436-37 (1995) (quoting *Brecht*, 507 U.S. at 627); *see also United States v. Dominguez Benitez*, 542 U.S. 81, 82 n.7 (2004). The harmless error inquiry asks

> not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which the jury actually rested its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

*Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (citations omitted); *see also Wilson v. Mitchell*, 498 F.3d 491, 504 (6th Cir. 2007).

---

[6] On direct appeal, in contrast, errors are assessed under the "harmless beyond reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967).

At the outset of our analysis, we must begin by acknowledging that the improperly admitted statement was a critical piece of evidence.[7] At trial, Mr. Smiley never denied having shot Garrett; indeed, the prosecution introduced all of Mr. Smiley's statements to the police. The jury, accordingly, heard Mr. Smiley's story about the serious altercation between Garrett and Mr. Smiley immediately before Mr. Smiley shot Garrett, but it also heard Mr. Smiley's repeated denials, prior to his confession, of any involvement in the murder. Mr. Smiley's sole defense, based on his confession, was that he had shot Garrett because he had feared for his life. The jury's main task at trial, therefore, was to determine what Mr. Smiley's mental state had been when he pulled the trigger. The Wisconsin trial court's instructions gave the jury several options: (1) it could reject the self-defense theory in its entirety and convict Mr. Smiley, as it ended up doing, of first-degree intentional homicide; (2) it could convict Mr. Smiley of second-degree intentional homicide, accepting a theory of imperfect self-defense;[8] or

---

[7] *See Agnew v. Leibach*, 250 F.3d 1123, 1135 (7th Cir. 2001) (evaluating the importance of the improperly admitted evidence to the prosecution's case); *see also Zappulla v. New York*, 391 F.3d 462, 472 (2d Cir. 2004) (discussing the "importance of the improperly admitted evidence").

[8] Wis. Stat. § 940.01(2)(b) ("Death was caused because the actor believed he or she or another was in imminent danger of death or great bodily harm and that the force used was necessary to defend the endangered person, if either belief was unreason-

(continued...)

(3) it could elect to acquit Mr. Smiley, accepting fully his self-defense story.[9] These instructions and Mr. Smiley's self-defense strategy make clear that Mr. Smiley's trial essentially was a referendum on the truthfulness of his second statement to the police in which he described his mental state during the struggle between himself and Garrett. The improperly admitted statement, in which he had lied, therefore was a key piece of evidence to a jury that had to decide whether to believe Mr. Smiley's account. In short, the inadmissible statement was key to the jury's consideration of all three choices set forth in the instructions. *See Henry v. Kernan*, 197 F.3d 1021, 1030 (9th Cir. 1999) (noting that the "State's use of the challenged statements [obtained in violation of *Miranda*] went to the root of their burden to prove beyond a reasonable

---

[8] (...continued)
able."); *id.* § 940.01(3) (noting that, to sustain a conviction for first-degree intentional homicide, the *burden of proof is on the State* to prove beyond a reasonable doubt that the facts constituting the defense did not exist).

[9] Wis. Stat. § 939.48(1) ("A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.").

doubt that Henry acted with the intent required for a conviction of first or second degree murder, and not in self-defense"); *see also DePetris v. Kuykendall*, 239 F.3d 1057, 1063-65 (9th Cir. 2001) (discussing the importance of credibility in self-defense cases and holding that an error was not harmless because the improperly admitted evidence affected the jury's choice among acquittal, imperfect self-defense or first-degree murder).

Throughout the trial, moreover, the prosecutor placed great weight on Mr. Smiley's inadmissible first statement, using it to depict Mr. Smiley as an individual who, calmly and deliberately, had devised an elaborate self-defense story to frustrate the authorities. During his opening statement, the prosecutor emphasized that the State would show that Mr. Smiley had denied extensively any involvement in Garrett's murder but then had admitted to having done it in self-defense:

> I have mentioned to you that one of the things the defendant said was that it was self-defense. You will hear from the detectives that initially he said I wasn't there. I didn't do anything. I don't know anything. I don't have anything to do with this. Later he says well, yeah, I was there and I did have something to do with it and I had to do it. In between . . . I didn't do it and I did it for a reason is an illusion.

R.15, Ex. V at 30-31. During summation, the prosecutor repeatedly used Mr. Smiley's first statement to impugn Mr. Smiley's credibility. He characterized Mr. Smiley's self-defense story as "illusion, deception, misdirection, lies, calculated," and he depicted Mr. Smiley as "cold, calm,

[and] calculating." *Id.*, Ex. X at 31-32. The prosecutor continued:

> [Mr. Smiley's first statement] demonstrates how cool, calm, and collected Mr. Smiley was. He tried to mislead his family by acting like a person with nothing to hide. When told the police were looking for him, he says, Oh, or words to this effect, you say the police want to talk to me? Fine, no problem, and calls the police. He then proceeds to spend an hour to two hours with two detectives in the homicide unit giving them a line—I have down here a line of bull—well, a line until a chance observation of blood on his clothes causes him to switch to plan B. Imagine that. You've done what the defendant did and you simply trot down to the police station and sit there, and for well over an hour you describe going here, going there, being with so and so, picking up the snake, getting rid of the snake. That's bold. That's cool.
>
> [Exhibits] 119 and 120 are the handwritten and typed summaries of what Mr. Smiley had to say. Once it was obvious he wasn't going to succeed with the, quote, an intruder burglar did it ruse, it is illogical to believe that Mr. Smiley went from deception, illusion and misdirection to candor, completeness and contrition. He did not do a 180 degree turn. He makes a claim of self-defense, but there is a recurring display of self-serving, self-preserving and self-centeredness.
>
> The second statement contains some truth, but it contains much that you should reject as untrue. Further, the parts that you conclude are untrue should

be held against Mr. Smiley. That is, people lie to gain something. The truth leads to consequences they view as unfavorable. The lie is intended to allow for undeserved, favorable consequences. So when you find a lie, don't just ignore it. You use it to calculate the truth because if someone's pointing you in that direction, that's a lie. There is a very strong likelihood you should be looking the opposite way, but that's for you to reconcile, for you to calculate the truth and to do what you can to assure that the appropriate consequences attend the act.

R.8, Ex. N at 22-23. The jury, thus, was exposed repeatedly to the inadmissible first statement, and, from the prosecutor's emphasis, it is evident that the State itself believed that this evidence was critical in obtaining Mr. Smiley's conviction. *See Arizona v. Fulminante*, 499 U.S. 279, 297-98 (1991) (noting that "the State recognized that a successful prosecution depended on" the improperly admitted evidence); *Satterwhite v. Texas*, 486 U.S. 249, 260 (1988) (explaining that the error was not harmless, in part, because "the prosecution placed significant weight" on the inadmissible evidence); *Zappulla v. New York*, 391 F.3d 462, 471 (2d Cir. 2004) (discussing, in the harmless error context, "whether the prosecutor found the erroneously admitted evidence to be important," and concluding that the "prosecutor heavily emphasized" the inadmissible evidence); *Murillo v. Frank*, 402 F.3d 786, 792-93 (7th Cir. 2005).

Absent the improperly admitted statement, the jury could well have determined that Mr. Smiley's self-defense

story was consistent with the physical evidence and testimony that was presented at trial. For example, Mr. Smiley's second statement explained that he had been walking with a limp because Garrett, who was much larger than Mr. Smiley, had swung him around, causing Mr. Smiley to hit his knee against a wall. The second statement also provided an explanation for the bite mark that the officers had observed on Mr. Smiley's back, and that explanation was consistent with Mr. Smiley's description of the manner in which he and Garrett had been interlocked during the struggle. Notably, the jury further could have found that the details of Mr. Smiley's story were consistent with the bullet wounds found on Garrett's body.[10] Finally, both Monica Walters, Garrett's girlfriend, and Dominique Washington, Mr. Smiley's girlfriend, testified that they too had suspected Garrett of various thefts, corroborating Mr. Smiley's account of how the altercation between he and Garrett began.[11] This nexus between his confession and the evidence proffered at trial increases the likelihood that the improper admission of Mr. Smiley's first statement, which discredited the exculpatory aspects of his confession, contributed to the conviction. *Cf. Hanrahan v. Thieret*, 933 F.2d 1328, 1340-41 (7th Cir. 1991) (explaining that the "less believable the defense, after all, the more likely the conclusion that the constitutional error did not contribute to the conviction," and concluding that the defendant was "unable

---

[10] R.15, Ex. W at 73, 75-77; *id.*, Ex. V at 134-35, 142-43, 146-49.

[11]  R.8, Ex. K at 35-38; *id.*, Ex. J at 14-15.

to reconcile his version of the events effectively with . . . the physical evidence"); *see also Baker v. Montgomery*, 811 F.2d 557, 560 (5th Cir. 1987) (denying habeas relief where the defendant's self-defense testimony "was contradictory to all other evidence and testimony before the jury").

The State nevertheless contends that, even if Mr. Smiley's first statement had been suppressed, the prosecutor would have been able to argue to the jury that Mr. Smiley was not credible. The State posits that, in making such an argument, the prosecutor could have pointed to Mr. Smiley's deceptive attempt to make the crime scene look as though Garrett had surprised a burglar and to Mr. Smiley's fleeing from the crime scene and hiding himself and the two guns at a friend's house. We believe that such an argument would have been far less damaging to Mr. Smiley's credibility than the argument that was made. The jury, for example, could have found (and Mr. Smiley's counsel certainly could have argued) that Mr. Smiley's staging of the crime scene and running away was a panicked reaction by a scared individual who had just engaged in a life-and-death struggle. Furthermore, contrary to the prosecutor's argument, the jury would have heard that Mr. Smiley had called the police as soon as he had heard that they were interested in speaking with him—a fact that Mr. Smiley's counsel could have argued was evidence of Mr. Smiley's candor and of a lack of consciousness of guilt and therefore consistent with self-defense. Because the State did not have other evidence similarly impeaching Mr. Smiley's credibility, the improperly admitted evidence was not

cumulative, a consideration that cuts against a finding of harmlessness. *See Fulminante*, 499 U.S. at 299-300 (noting that the improperly admitted confession "was *not* merely cumulative of the other" (emphasis in original)); *Agnew v. Leibach*, 250 F.3d 1123, 1135 (7th Cir. 2001) (same).[12]

To summarize, Mr. Smiley's criminal conviction hinged on his credibility, the improperly admitted evidence was oft-used and instrumental in undermining that credibility, and Mr. Smiley's self-defense theory was not a frivolous one. We recognize, as the State notes, that Mr. Smiley could not have testified at trial without risking the admission of his first statement for purposes of impeachment. *See Harris v. New York*, 401 U.S. 222 (1971). Nevertheless, we must resolve the harmless error issue on the record before us and without hypothesizing whether "in a trial that occurred without the error, a guilty verdict would surely have been rendered." *Sullivan*, 508 U.S. at 279. Consequently, we must conclude that the admission of Mr. Smiley's first statement to the police had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.

---

[12] *Cf. Hinton v. Uchtman*, 395 F.3d 810, 820-21 (7th Cir. 2005) (holding that the error was harmless because the improperly admitted evidence was cumulative).

## Conclusion

For the foregoing reasons, the judgment of the district court, granting the writ of habeas corpus, is affirmed.

AFFIRMED